**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 25 1999**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
## TENH CIRCUIT

JACK L. DAVOLL; DEBORAH A.
CLAIR; PAUL L. ESCOBEDO,

     Plaintiffs-Appellants,

v.

WELLINGTON WEBB, in his capacity as
the Mayor of the City and County of
Denver; THE CITY AND COUNTY OF
DENVER; DAVID L. MICHAUD, in his
capacity as the Chief of the Denver Police
Department; ELIZABETH H. MCCANN, in
her capacity as the Manager of Safety for
the City and County of Denver; THE
CIVIL SERVICE COMMISSION, for the
City and County of Denver,

     Defendants-Appellees.

No. 97-1381

JACK L. DAVOLL, DEBORAH A.
CLAIR, PAUL L. ESCOBEDO,

     Plaintiffs-Appellees,

v.

WELLINGTON WEBB, in his capacity as
the Mayor of the City and County of
Denver; DAVID L. MICHAUD, in his
capacity as the Chief of the Denver Police
Department; ELIZABETH H.

No. 97-1406

MCCANN, in her capacity as the Manager of Safety for the City and County of Denver; THE CIVIL SERVICE COMMISSION, for the City and County of Denver,

      Defendants,

and

THE CITY AND COUNTY OF DENVER,

      Defendants-Appellants.

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

      v.

DENVER POLICE DEPARTMENT; THE CITY AND COUNTY OF DENVER,

      Defendants-Appellants.

Nos. 97-1403
97-1431

---

Appeal from the United States District Court
for the District of Colorado
(D.C. Nos. 93-K-2263 and 96-K-370)

---

David C. Feola, of King Minning Clexton & Feola, LLC, Denver, Colorado (Law Office of Marilee E. Langhoff, Littleton, Colorado, with him on the brief), for Plaintiffs-Appellants/Cross-Appellees.

-2-

Sybil Ruth Kisken, Assistant City Attorney (Daniel E. Muse, City Attorney, J. Wallace Wortham, Jr., Asst. City Attorney Supervisor, Ashley Rea Kilroy, Asst. City Attorney, and Grace Fell Regan, Asst. City Attorney, with her on the briefs), of Denver, Colorado, for Defendants-Appellees/Cross-Appellants.

Seth M. Galanter, Attorney, Department of Justice (Jessica Dunsay Silver, Attorney, Department of Justice, with him on the briefs), Washington, D.C., for Plaintiff-Appellee, United States of America.

---

Before **SEYMOUR**, Chief Judge, **BRORBY** and **HENRY**, Circuit Judges.

---

**SEYMOUR**, Chief Judge.

Former Denver police officers Jack Davoll, Deborah Clair, and Paul Escobedo sued the City and County of Denver, as well as Mayor Wellington Webb, Police Chief David L. Michaud, and Manager of Safety Elizabeth H. McCann, in their official capacities, for violating the officers' rights under Title I and Title II of the Americans with Disabilities Act (ADA), 104 Stat. 328, 42 U.S.C. §§ 12112, 12132, and the Equal Protection Clause of the Fourteenth Amendment. About a year and a half later, the United States filed a two-part complaint against the City and County of Denver, alleging a violation of Title II of the ADA on behalf of Jack Davoll, and a pattern and practice of discrimination under Title I of the of ADA.

The district court granted Denver's motion for summary judgment on the officers' equal protection claim, but denied summary judgment based on the officers' failure to meet the exhaustion requirements of Title I of the ADA. The Court expressly declined to decide whether the officers had properly exhausted their claims under Title I, and instead treated their claims as actions pursuant to Title II, which contains no exhaustion requirement. The Court consolidated the United States' action on behalf of Jack Davoll and the liability phase of the United States' pattern and practice claim with the officers' ADA claims. Prior to trial, the district court granted summary judgment in favor of the United States on the liability phase of its pattern and practice suit. The remaining ADA claims

were tried to a jury, which found in favor of all three officers and awarded compensatory damages totaling $800,000. The district court also awarded equitable relief. After the trial, the court certified for immediate appeal its summary judgment order in favor of the United States on the liability phase of the pattern and practice suit.

Denver appeals from the trial verdict, contesting jury instructions, sufficiency of the evidence, evidentiary and discovery rulings, and the remedies awarded. Denver also contests the grant of summary judgment to the United States on its pattern and practice claims. The officers (hereinafter plaintiffs) cross-appeal, contending the district court erred in denying their motion for class certification, by granting summary judgment for Denver on their equal protection claim, and by limiting their front pay award to two years from the judgment. We consolidated the appeals and we now affirm in part, and reverse and remand in part.

# I

## BACKGROUND

Mr. Davoll, Ms. Clair, and Mr. Escobedo are all former Denver police officers who were injured in the line of duty and forced to retire due to Denver's

policy forbidding disabled police officers from transferring into other vacant positions in the city government. We discuss Denver's policies on reassignment as well as each plaintiff in turn.[1]

## A.     Denver's Classified and Career Service Systems

The City and County of Denver, which has an overall budget of $1.5 billion, employs approximately 12,000 people. Most of these employees are enrolled in one of two personnel systems: the Classified Service, which is composed of police officers and firefighters, or the Career Service, which contains almost all other city employees. Denver pays the salaries, insurance, and other benefits of the employees in both systems. Evidence at trial revealed that although a unified system would be less costly and reduce duplication of efforts, the division remains primarily because of territorialism and turf wars. Denver prohibits the reassignment of employees in the Classified Service to the Career Service and vice-versa, although both systems purport to be merit based.

The Career Service has approximately 8,000 full-time and 1,500 temporary positions. Each year, it seeks to fill approximately 2,200 vacancies, 1,500 of which are for full-time employment. The Career Service system was set up by a

---

[1] In reciting the facts, we view the evidence in the light most favorable to the plaintiffs and United States because the jury found in their favor. *See Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 988 (10th Cir. 1999).

charter which the voters of Denver approved. Its hiring rules provide that candidates must submit an application and meet the minimum qualifications for a vacant position. Candidates that do so are then tested. The Career Service Authority generates an eligibility list as a result of this screening. The hiring agency interviews those at the top of the list, although it does not know the candidates' actual scores or rankings. The agency may hire anyone on this list.

The hiring agency also may hire any one of a number of people not on the eligibility list. For example, an employee within the Career Service who meets the minimum qualifications may request an interview from the agency directly without testing for the position. If the request is granted, that person would be placed on a transfer list and could be hired. Moreover, if the manager hiring for the vacancy would like a particular Career Service employee to fill the vacancy and the employee agrees, the manager could make the transfer without ever referencing the lists of applicants. There is also a list for those Career Services employees who meet the qualifications and wish to be promoted to the vacant position. In this way, Career Service employees bypass the testing procedures for a vacancy within the Career Service. Classified Service employees are not permitted to transfer into the Career Service, and must compete with all non-City employees for any vacancies within the Career Service personnel system.

The Classified Service employs over 1,400 police officers. In order to

become a police officer, a candidate must pass a written test, a physical abilities test, a medical test, a polygraph test, a psychological examination, and a background check, and must have an oral interview. Police officers that are separated under honorable circumstances may be reemployed without competing with the general applicant pool.

According to the city, all police officers must be able to shoot a gun and make a forcible arrest. If a police officer is injured in the line of duty so that he cannot perform those required functions, the police department will retain the officer as long as his condition is improving. Once a doctor determines that the injured officer has reached "maximum medical improvement," the officer has 365 days to recover enough to perform the required functions. If he cannot shoot a gun or make a forcible arrest within that time frame, he must retire. In the interim period, the police department assigns injured officers to light duty work that does not involve shooting a gun or making forcible arrests. Approximately four police officers a year retire due to occupational disabilities.

Not all positions within the Denver Police Department (DPD) require the ability to shoot a gun or effect a forcible arrest. The DPD has been actively engaged in a process of "civilianization" whereby positions that were once performed by emergency service officers, who are by definition Classified Service employees, are now performed by members of the Career Service. The

civilianized positions entail the same duties as before but do not require firing a weapon or making forcible arrests. Positions such as emergency service dispatcher, criminal justice technician, and victim advocate have been civilianized. There are approximately 200 Career Service employees in the DPD, and between twenty-four and thirty-six Career Service vacancies a year within the DPD. Injured police officers are not reassigned to these positions because these jobs are now considered a part of the Career, as opposed to Classified, Service.

At trial, Denver asserted that permitting reassignment of injured police officers to Career Service positions would hurt employee morale. Denver never studied the cost of such a measure, or attempted to modify the dual service system to accommodate the disabled plaintiffs. A Denver official admitted that such reassignment would not impose an undue monetary burden on the city. The jury found that reassigning plaintiffs from the Classified to Career Service system would not impose an undue burden on defendants.

## B. Jack Davoll

Jack Davoll has spent almost all of his working life in law enforcement and served as a police officer with the DPD from March 1984 to July 1993. While working at the DPD, he performed well and received numerous commendations. In January 1991, a Jeep Cherokee involved in a high-speed chase struck the patrol car in which Mr. Davoll was riding. He sustained numerous injuries as a result of

the accident.

Following the accident, Mr. Davoll participated in physical therapy in an effort to cure the injuries to his neck, back, and shoulder. The therapy helped him regain some of his strength but did not rehabilitate him enough to return to his position as a patrol officer. In fact, as a result of the accident Mr. Davoll suffers from degenerative disk disease, a permanent condition which causes him severe back pain. He has difficulty walking distances, especially on uneven terrain, cannot sit for more than two hours at a time, cannot stand for extended periods of time, and has difficulty bending or twisting. Dr. Kleen, his treating physician, testified that Mr. Davoll's condition is so sensitive he could be paralyzed were he to get into an altercation. Dr. Kleen therefore restricted him to light to medium-duty jobs.

After the accident, Mr. Davoll worked in various limited-duty positions in the DPD, such as desk clerk and juvenile intake clerk, and performed well. During 1992, Mr. Davoll learned that the DPD would likely try to force his retirement and he explored options that would allow him to stay employed in some capacity with the DPD. When Mr. Davoll worked at the juvenile intake desk, he asked his supervisor if he could remain in that position. His request was denied. Mr. Davoll also inquired about reassignment into a Career Service position but was told that was not possible. The DPD forced him to retire

effective July 1993.

After his retirement, Mr. Davoll continued to look for employment both in and outside the city government. He applied for several jobs with the city and was found qualified for every position for which he tested including senior criminal investigator, staff probation officer, and code enforcement agent. However, he was not offered any of those jobs. Mr. Davoll took a job in security surveillance at a casino and a job at the Adams County jail, but he had to quit both because the walking caused him too much pain. He eventually found employment as an emergency dispatcher with Jefferson County Schools.

## C.    Deborah Clair

Ms. Clair served as a police officer with the DPD from 1980 to April 1992. For several years prior to that, she had worked in the reserve force of the police department, assisting and augmenting the regular force officers in their duties. While working for the DPD, Ms. Clair received commendations and good evaluations for her performance. In March 1982, she was responding to a domestic violence call when her vehicle was struck broadside by a drunk driver who had run a stop sign. The impact forced Ms. Clair's vehicle into a telephone pole and she sustained numerous injuries.

After the accident, Ms. Clair sought treatment for the injuries to her leg, back and neck, and did physical therapy for several years. She continued to work

for the DPD, but her pain worsened throughout the years, especially in her back and neck. Doctors eventually diagnosed her with degenerative disk disease and in 1991 performed surgery on her back to remedy her condition. Although the surgery did relieve some of the pain, Ms. Clair did not recover enough to return to her position as a police officer. Like Mr. Davoll, she risks paralysis if she is involved in an altercation. She has difficulty sitting, standing, and walking.

The DPD decided to retire Ms. Clair effective April 15, 1992. At that time, she knew there was a policy prohibiting the transfer of officers with disabilities to civilian positions, and Sargent George Maes told Ms. Clair that neither the DPD nor the city administration would help Ms. Clair find another job. Had the reassignment policy been otherwise, she would have pursued further employment with the city. Ms. Clair's years of experience with the DPD qualified her for numerous City vacancies existing around the time of her retirement, including Victim Advocate, Senior Criminal/ Civil Investigator, Staff Probation Officer and Criminal Justice Specialty Clerk. No one at the DPD alerted Ms. Clair to these openings, and Ms. Clair did not apply for them because she knew of the city's policy forbidding reassignment of disabled police officers. Instead, Ms. Clair moved outside of Denver and took over a horse-drawn carriage company.

**D. Paul Escobedo**

Mr. Escobedo was employed by the DPD from 1980 to December 1992.

During that time, he received numerous commendations and good performance evaluations. He was also involved in several accidents and altercations in which he sustained injuries to his elbow, thumb, back, neck, and wrist.

Mr. Escobedo engaged in physical therapy and underwent surgery to remedy his injuries. While that treatment helped, he did not improve sufficiently to return to work as a police officer. Specifically, Mr. Escobedo's thumb injury was so severe he had to have his right thumb joint surgically fused, thereby rendering him unable to fire a weapon with that hand. He also suffers from chronic severe pain in his back and neck which interferes with his ability to sit for prolonged periods, to sleep, and to lift.

After Mr. Escobedo's thumb surgery, the DPD placed him in the limited duty section, where he performed primarily clerical work. During that time, he inquired about possible job opportunities with the Career Service, but he was told it would be impossible for him to transfer because the charter prohibited it. He also raised the issue of the ADA, but was told it "has nothing to do with you." Aplt. App. at 3230. The DPD retired Mr. Escobedo on December 2, 1992. The next day, he returned to work to perform his limited duty assignment. Sargent Maes called him soon after he arrived and asked him to leave.

Mr. Escobedo had difficulty finding suitable work after his forced retirement. He was qualified for several vacancies in the Career Service,

including Emergency Service Dispatcher, Criminal Justice Specialty Clerk, and Criminal Justice Technician, but the city never informed him of these positions. At the time of trial, Mr. Escobedo worked at a senior living center, driving the residents around and performing light maintenance work.

## II.

Before we turn to the merits of this appeal, we must determine whether we have subject matter jurisdiction over this action insofar as it was brought under Title II of the ADA. No party raised the issue below or on appeal but, after briefing, Denver submitted supplemental authority which it claimed questioned whether federal courts have subject matter jurisdiction over employment actions brought pursuant to Title II. *See Zimmerman v. Oregon Dept. of Justice*, 170 F.3d 1169 (9th Cir. 1999) (holding Title II does not extend to employment discrimination because Title I explicitly covers such action).[2] If the issue

---

[2] Title II of the ADA provides in pertinent part:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disabililty, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

implicates subject matter jurisdiction, we have an obligation to address it

"regardless of normal rules governing the presentation of issues." *International*

*Union of Operating Eng'rs, Local 150 v. Rabine*, 161 F.3d 427, 429 (7th Cir.

1998); *see also Steel Co. v. Citizens for a Better Env't*, 118 S. Ct. 1003, 1011

(1998). Consequently, we ordered supplemental briefing on whether the issue of

Title II coverage is one of subject matter jurisdiction and, if so, whether Title II

applies to employment discrimination actions. Because we conclude the question

is not one that implicates our subject matter jurisdiction,[3] and because the issue

was not raised below or on appeal, we do not address whether Title II in fact

covers employment actions. *See FDIC v. Noel*, 177 F.3d 911, 915 (10th Cir.

1999).

"[T]he absence of a valid (as opposed to arguable) cause of action does not

---

[3] Cases and statutes will on occasion use the term "jurisdiction" loosely and not simply to designate a case beyond the courts' purview. *See Steel Co.*, 118 S. Ct. at 1010; *Rabine*, 161 F.3d at 430. As the Second Circuit noted, the difference between a question of subject matter jurisdiction and one of failure to state a claim is "a 'lesson that has been taught as often in decision as it has been ignored in argument and dicta.'" *Nowak v. Ironworkers Local 6 Pension Fund*, 81 F.3d 1182,1188 (2d Cir. 1996) (quoting *Fogel v. Chestnutt*, 668 F.2d 100, 106 (2d Cir. 1981)); *see also* 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1350, p. 196 (2d ed. 1990). That distinction, although often ignored, can have significant and even dispositive impact on a case, and courts should carefully consider whether a dismissal is truly jurisdictional as defined by *Steel Co. v. Citizens for a Better Environment*, 118 S. Ct. 1003 (1998), and *Bell v. Hood*, 327 U.S. 678 (1946).

implicate subject matter jurisdiction, i.e., the courts' statutory or constitutional power to adjudicate the case." *Steel Co.*, 118 S. Ct. at 1010. "Jurisdiction . . . is not defeated . . . by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover." *Bell v. Hood*, 327 U.S. 678, 682 (1946). Rather, "where the complaint . . . is so drawn as to seek recovery directly under the Constitution or the laws of the United States, the federal court, but for two possible exceptions . . . must entertain the suit." *Id.* at 681-82. The two exceptions come into play "where the alleged claim under the Constitution or federal statues clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous." *Id.* at 682-83; *see also Cardtoons, L.C. v. Major League Baseball Players Assoc.*, 95 F.3d 959, 965 (10th Cir. 1996). If the applicability of the federal statute upon which a plaintiff relies is genuinely at issue, the federal courts possess jurisdiction and should reach the merits of the claim. *See Steel Co.*, 118 S. Ct. at 1010; *see also Wheeldin v. Wheeler*, 373 U.S. 647, 649 (1963); *Nowak*, 81 F.3d at 1188 (quoting 2A JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE ¶ 12.07 [2.1] at 12-60 (2d ed. 1995)) ("'[I]f a federal statute upon which a claim is premised is interpreted to be inapplicable, it could be argued that the plaintiff has failed to present a federal question and thus subject matter jurisdiction is absent. However . . . in such instances the preferable practice is to

-16-

assume that jurisdiction exists and proceed to determine the merits.").

The Supreme Court's decision in *Steel Co.*, 118 S. Ct. 1003, exemplifies this principle. The Court was concerned there with whether the Emergency Planning and Community Right-To-Know Act of 1986 (EPCRA), 42 U.S.C. § 11406 (a)(1), authorizes suits for purely past violations. *See id.* at 1008. The Court noted that subject matter jurisdiction was proper "if 'the right of petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another.'" *Id.* at 1010 (quoting *Bell*, 327 U.S. at 685). The Court also observed that it was neither frivolous nor immaterial to contend that EPCRA applied to past violations. *Id.* Because respondent would win if the Court construed EPCRA to apply to purely past violations, and would lose if it did not apply, and because the claim was not subject to either of the narrow *Bell* exceptions, the Court ruled that the issue did not implicate subject matter jurisdiction.[4]

A similar analysis leads us to conclude that whether Title II applies to an employment discrimination action does not raise a jurisdictional question. Here, plaintiffs' complaint alleged claims of employment discrimination based on

---

[4] The Court did not reach the merits of the case, however, because it held the plaintiffs lacked Article III standing. *See Steel Co. v. Citizens for a Better Environment*, 118 S. Ct. 1003, 1020 (1998).

disability under Title II of the ADA.[5]  As they wrote their complaint to allege a

federal cause of action, we have subject matter jurisdiction unless their

allegations are immaterial or insubstantial.  They are neither.

Title II provides that "no qualified individual with a disability shall, by

reason of such disability, be excluded from participation in or be denied the

benefits of the services, programs, or activities of a public entity, *or be subjected

to discrimination by any such entity*."  42 U.S.C. § 12132 (emphasis added).

Whether that provision encompasses employment discrimination is a difficult

question that has split the circuits.  *Compare Zimmerman*, 170 F.3d 1169, *with

Bledsoe v. Palm Beach County Soil & Water Conserv. Dist.*, 133 F.3d 816 (11th

Cir. 1998) (holding that Title II does extend to employment discrimination).

While we do not pass on that question here, plaintiffs' claim that Title II covers

employment discrimination is certainly not frivolous or immaterial.  Thus, the

federal courts possess subject matter jurisdiction to consider the claim.

Our conclusion is supported by the fact that the many courts addressing the

question have not treated it as one of subject matter jurisdiction.[6]  Rather, the

---

[5]  Plaintiffs also brought their claims under Title I of the ADA.  Denver filed for summary judgment based on plaintiffs' alleged failed to meet the exhaustion requirements of Title I.  The court expressly declined to decide that question and instead allowed plaintiffs to proceed on their coextensive Title II claims.  *See Davoll v. Webb*, 943 F. Supp. 1289, 1297-98 & n.5 (D. Colo. 1996).

[6]  Denver relies on *Iskander v Rodeo Sanitary Dist.*, No. C-94 0479-SC, 1995 WL 56578 (N.D. Cal. 1995), a pre-*Steel Co.* case, to argue that this issue

-18-

issue of whether Title II covers employment discrimination has been raised and considered on motions to dismiss for failure to state a claim, *see, e.g., Zimmerman*, 170 F.3d at 1171; *Patterson v. Illinois*, 35 F. Supp.2d 1103, 1104 (C.D. Ill. 1999); *Alberti v. City & County of San Francisco Sheriff's Dept.*, 32 F. Supp.2d 1164, 1167 (N.D. Cal. 1998), *overruled by Zimmerman*, 170 F.3d 1169; *Petersen v. University of Wisconsin Bd. of Regents*, 818 F. Supp. 1276, 1276-77 (W.D. Wis. 1993); *cf. Innovative Health Sys. v. City of White Plains*, 117 F.3d 37, 42 (2d Cir. 1997) (whether ADA applied to zoning), or motions for summary judgment, *see, e.g., Bledsoe*, 133 F.3d at 818; *Downs v. Massachusetts Bay Transp. Auth.*, 13 F. Supp.2d. 130, 134 (D. Mass. 1998); *Decker v. University of Houston*, 970 F. Supp. 575, 576-77 (S.D. Tex. 1997); *Hernandez v. City of Hartford*, 959 F. Supp. 125, 132-33 (D. Conn. 1997); *Wagner v. Texas A & M Univ.*, 939 F. Supp. 1297, 1308 (S.D. Tex. 1996); *cf. Johnson v. City of Saline*, 151 F.3d 564, 567, 569 (6th Cir. 1998) (whether Title II applied to contracting).[7]

does implicate our subject matter jurisdiction. We are not persuaded. First, *Iskander* declined jurisdiction over plaintiff's ADA claim because her employer did not have the requisite number of employees and not specifically because Title II did not cover employment actions. *See id.* at *9. Second, we question its use of the term "jurisdiction" in light of *Steel Co.*, 118 S. Ct. at 1010. *See Sharpe v. Jefferson Distrib. Co.*, 148 F.3d 676,677 (7th Cir. 1998), *abrogated on other grounds by Papa v. Katy Indus., Inc.*, 166 F.3d 937 (7th. Cir. 1999); *Saxon v. Orthodontics*, No. 98-2401-JWL, 1999 WL 232913, *1 (D. Kan. 1999). *But see Owens v. Rush*, 636 F.2d 283, 287 (10th Cir. 1980).

[7] We recognize that in certain circumstances a 12(b)(1) motion for lack of subject matter jurisdiction must be converted into a 12(b)(6) motion or a motion

Because the issue is not jurisdictional and because Denver did not raise it below or on appeal, we expressly decline to decide whether Title II covers employment discrimination. Instead, we assume that it does and turn to the issues properly on appeal.

## III.

### A.    Jury Instructions

Denver asserts that the district court erred in refusing to give two of its proposed instructions, and that several of the jury instructions given misstated the law. We review the district court's decision whether to give a particular instruction for an abuse of discretion. *See Allen v. Minnstar*, 97 F.3d 1365, 1368 (10th Cir. 1996). We review de novo "whether, as a whole, the instructions correctly stated the governing law and provided the jury with an ample understanding of the issues and applicable standards." *Id.* "Instructional error requires reversal only if the error is determined to have been prejudicial, based on a review of the record as a whole." *Morrison Knudsen Corp. v. Fireman's Fund Ins. Co.*, 175 F.3d 1221, 1236 (10th Cir. 1999) (internal quotation marks omitted).

---

for summary judgment. *See Tippett v. United States*, 108 F.3d 1194, 1196 (10th Cir. 1997). However, that was not the situation in any of the above-cited cases.

### 1.    *"Qualified Individual with a Disability"*

Denver contends the district court erred in instructing the jury that plaintiffs were "qualified individuals with disabilities" under the ADA if they could perform the essential functions of the positions which they desired rather than the position which they held. Denver argues that because the three plaintiffs admitted they could not perform the essential functions of the police officer position, that is, fire a weapon or effect a forcible arrest, the ADA does not apply to them.

This court recently addressed this issue in *Smith v. Midland Brake Inc.*, 180 F.3d 1154 (10th Cir. 1999) (en banc). We relied there on the ADA's statutory text and legislative history to conclude that " a 'qualified individual with a disability' includes a disabled employee who desires and can perform with or without reasonable accommodation an available reassignment job within the company, though unable to perform his or her existing job." *Id.* at 1161. We noted that nearly every circuit addressing the issue has adopted this interpretation of "qualified individual with a disability." *See id.* at 1162-63 (citing cases).

Here, the district court instructed the jury that a "qualified individual with a disability" need only be able to perform the essential functions of the job to which he or she desires to be reassigned, and not of the position which he or she holds. Under *Smith*, this instruction was correct.

-21-

## 2. *Reassignment as "Reasonable Accommodation"*

Denver also contends the district court erred in instructing the jury that the ADA mandates reassignment as a reasonable accommodation in certain circumstances. In essence, Denver's position is that reassignment is always optional for an employer and therefore a failure to reassign cannot serve as a basis for liability. We addressed this issue in *Smith* as well.

We held in *Smith* that "reassignment of an employee to a vacant position in a company is one of the range of reasonable accommodations which *must* be considered and, if appropriate, offered if the employee is unable to perform his or her existing job." *Id.* at 167 (emphasis added). We recognized that reassignment may not always be an appropriate form of reasonable accommodation. For example, if possible the employer should reasonably accommodate the employee within his or her existing job instead of reassigning him or her. *See id.* at 1170-71. If such accommodation is impossible, the employer need only reassign the employee to an existing vacant position for which the employee is qualified. *See id.* at 1170. Moreover, an employer need not reassign an employee to a position which would be a promotion or would constitute an undue burden on the employer. *See id.*

Notwithstanding these limitations, "the reassignment obligation . . . mean[s] something more than merely allowing a disabled person to compete

equally with the rest of the world for a vacant position." *Id.* at 1165.  Although

the right to reassignment is not absolute, "it may very well be determined that

reassignment is a reasonable accommodation under all of the circumstances.  If it

is so determined, then the disabled employee has a right in fact to the

reassignment, and not just to the consideration process leading up to the potential

reassignment." *Id.* at 1166; *see also id.* at 1167.  Hence, under *Smith*, a failure to

reassign a disabled employee most certainly can constitute discrimination, and

therefore a basis for liability, under the ADA.

Here, plaintiffs' positions as police officers could not be modified to

accommodate their disabilities and consideration of reassignment was therefore

appropriate.  The district court correctly instructed the jury that reassignment may

be required, subject to various limitations.

### 3. *Futility Instruction*

Denver next contends the district court incorrectly instructed the jury that

plaintiffs need not have requested reassignment if they knew the employer had a

policy forbidding it.  Denver argues that this instruction erroneously relieved

plaintiffs of their obligation to initiate the interactive process envisioned by the

ADA.[8]  Plaintiffs do not dispute the importance of the interactive process in

---

[8] "The federal regulations implementing the ADA 'envision an interactive process that requires participation by both parties,'" *Templeton v. Neodata Servs., Inc.*, 162 F.3d 617, 619 (10th Cir. 1998) (quoting *Beck v. University of Wisconsin*

accommodating employees but assert that when the employer has an established policy against reassignment, the ADA does not require employees to engage in the "futile gesture," *International Bhd. of Teamsters v. United States*, 431 U.S. 324, 366 (1977), of requesting reassignment.

In *Teamsters*, the Supreme Court recognized that "[a] consistently enforced discriminatory policy can surely deter job applications from those who are aware of it and are unwilling to subject themselves to the humiliation of explicit and certain rejection." *Id.* at 365. For example, "[i]f an employer should announce his policy of discrimination by a sign reading "Whites Only" on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs." *Id.* Therefore, "[w]hen a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an

---

*Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996)). We affirmed the importance of this process in *Smith*, 180 F.3d at 1171-72. In general, an employee requiring a reasonable accommodation will need to initiate the interactive process by notifying the employer of his disability and resulting limitations, and requesting reassignment if no reasonable accommodation is possible in the employee's existing job. *See id.* "In expressing a desire for reassignment, an employee need not use magic words." *Id.* at 1172. Both parties thus have an obligation to interact in good faith to determine how to reasonably accommodate the employee. *See id.* Typically, employees and employers will determine reasonable accommodations through this process. *See id.*

application." *Id.* at 365-66. In order for a nonapplicant plaintiff to merit relief, he has "the not always easy burden of proving that he would have applied for the job had it not been for [the employer's discriminatory] practices." *Id.* at 368.

Significantly, the legislative history of the ADA specifically indicates that the futile gesture doctrine enunciated in *Teamsters* applies to employment actions. *See* H. Rep. No. 101-485 (II) at 82-83 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 365; S. Rep. No. 101-116 at 43 (1989). The logic of *Teamsters* similarly applies to ADA cases in which an employer has a set policy against a particular type of reasonable accommodation, or against such accommodation generally. If a disabled employee actually knows of an employer's discriminatory policy against reasonable accommodation, he need not ignore the policy and subject himself "to personal rebuffs" by making a request that will surely be denied.[9]

Although the futile gesture doctrine is applicable in the ADA context, the burden is typically on the employee to initiate the interactive process. Only in the rare case where an employer has essentially foreclosed the interactive process

---

[9] This court has excused litigants in other contexts from engaging in exercises in futility. *See New Mexico Ass'n for Retarded Citizens v. New Mexico*, 678 F.2d 847, 851 (10th Cir. 1986) (finding that pursuit of individualized administrative remedies would be futile where plaintiffs sought restructuring of entire state system); *Gilchrist v. United States*, 430 F.2d 631, 633 (10th Cir. 1970) (excusing draftee from exhaustion requirement because appealing his reclassification would not effect Draft Board's underlying regulations).

through its policies or explicit actions will the futile gesture doctrine apply. *Cf.*

*Butelmeyer v. Fort Wayne Community Schs.*, 100 F.3d 1281, 1285 (7th Cir. 1996)

(excusing mentally ill plaintiff from requesting reasonable accommodation

because "he may have thought it was futile to ask, after [his employer] told him

he would not receive any more special treatment."). We emphasize that an

employee's subjective belief about the futility of initiating the interactive process

will not, by itself, relieve him or her of that obligation. *See Loulseged v. Akzo*

*Nobel Inc.*, 178 F.3d 731, 739 (5th Cir. 1999).

Here, all three plaintiffs were well aware of Denver's policy of refusing to

reassign disabled police officers to Career Service positions. At the same time,

DPD could not keep plaintiffs in their existing jobs because they could not fire

weapons or make forcible arrests. Consequently, the policy against transferring to

Career Services positions foreclosed the only reasonable accommodation that

could have assisted plaintiffs – reassignment. Under such circumstances,

plaintiffs could rely on the futile gesture doctrine.

Indeed, Ms. Clair's[10] experience illustrates why this doctrine must be a part

of the ADA framework. She not only was aware of Denver's policy against

---

[10] The record reflects that both Mr. Davoll and Mr. Escobedo affirmatively inquired about other job opportunities with the city and were rebuffed. They therefore satisfied their burden of initiating the interactive process. *See Smith*, 180 F.3d at 1171-72.

reassignment but was also explicitly told by Sargent Maes that the city would not help her find another position. Both Denver's set policy and Sargent Maes' comment effectively indicated that the city had no intention of engaging in the interactive process in good faith with Ms. Clair. Her "failure" to inquire about reassignment was a logical result of the city's position. Denver cannot preempt the interactive process with its policy and actions and then escape liability by claiming Ms. Clair did not properly initiate the process. *Cf. Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996) ("[N]either party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability.").

The district court instructed the jury that "[t]he employee is not required to request reassignment or transfer if he or she is aware that an employer has a policy of not providing that form of reasonable accommodation," Aplt. App. at 1445, and that the plaintiffs bore the burden of showing "[t]hat [he or she] asked to be reassigned, or but for his or her knowledge of the employer's 'no-reassignment' policy, would have asked to be reassigned," *id.* at 1448. Those instructions correctly explained the futile gesture doctrine.

### 4. *Equal Treatment*

Denver asserts the district court abused its discretion by refusing to instruct the jury that the ADA simply requires equal treatment. Denver proposed

-27-

instructions which explained that plaintiffs "were treated the same as all other employees of the City or the Denver Police Department." *Id.* at 1414; *see also id.* at 1416. The district court explained that it rejected the instruction in part because "[t]he ADA requires an employer to move beyond the traditional analysis used to appraise non-disabled workers and to consider reassignment to a vacant position as a method of enabling a disabled worker to do the job, without creating undue hardship." *Id.* at 2769.

As noted above, "the reassignment obligation . . . mean[s] more than merely allowing a disabled person to compete equally with the rest of the world for a vacant position." *Smith*, 180 F.3d at 1165. An employer's policy that does not provide accommodations for non-disabled workers who likely do not need it will not excuse the employer's failure to reasonably accommodate disabled workers. The district court acted well within its discretion in rejecting Denver's proposed instruction.

### 5. *Substantially Limited with Respect to the "Major Life Activity" of Working*

Denver contests the district court's rejection of its proposed jury instruction on whether plaintiffs were limited in a major life activity, and also claims the instruction defining "substantially limited with respect to working" was

misleading. We consider each claim in turn.[11]

The district court correctly instructed the jury that "major life activities" under the Americans with Disabilities Act include "sitting, standing, walking, lifting, reaching, performing manual tasks, working, and caring for oneself." Aplt. App. at 2878; *see McGuinness v. University of New Mexico Sch. of Med.*, 170 F.3d 974, 978 (10th Cir. 1999) (quoting 29 C.F.R. § 1630.2 (i)) (including caring for oneself, performing manual tasks, walking, and working in the definition of "major life activity" under the ADA); *Pack v. Kmart Corp.*, 166 F.3d 1300, 1305 (10th Cir. 1999) (noting that, inter alia, sitting, standing, lifting, and reaching constitute "major life activities" under the ADA); *Nielsen v. Moroni Feed Co.*, 162 F.3d 604, 610 n.11 (10th Cir. 1998) (listing "major life activities" under the ADA); *Lowe v. Angelo's Italian Foods, Inc.*, 87 F.3d 1170, 1173-74 (10th Cir. 1996) (noting "[t]he appendix to the regulations provides that 'other major life activities include, but are not limited to, sitting, standing, lifting, reaching,'" and holding that lifting is a "major life activity" under ADA). Denver did not contest

---

[11] We are unclear whether Denver is also arguing that plaintiffs must prove they are limited in a major life activity other than working. This court considers working to be a major life activity under the ADA, and so no additional limitation need be proved. *See Siemon v. AT&T Corp.*, 117 F.3d 1173,1176 (10th Cir. 1997) (finding that working is a major life activity and citing *Bolton v. Scrivner, Inc.*, 36 F.3d 939, 942 (10th Cir. 1994)). *But see Sutton v. United Airlines*, 119 S. Ct. 2139, 2151 (1999) (questioning whether work can be considered a major life activity under the ADA and assuming without deciding that it can).

this definition, but proposed that the district court also instruct the jury that "[i]n this case, the Plaintiffs claim they are limited in the major life activity of working." Aplt. App. at 1419. The district court declined to do so and Denver now asserts that "the private plaintiffs never pled or proved [the limitation of] a substantial life activity other than working." Aplt. Br. at 33.

Denver's contention is simply incorrect. The private plaintiffs' complaint did not enumerate the life activities in which they are substantially limited (working or otherwise), and the United States complaint on behalf of Jack Davoll specifically alleged that his injuries substantially limited his ability to "walk[], stand[], and work[]." Aplt. App. at 125. The pretrial record and trial transcript contain considerable evidence of plaintiffs' substantial limitations in various life activities including sitting, standing, lifting, reaching, and sleeping. Any assertion to the contrary is disingenuous. The district court was well with in its discretion to reject Denver's proposed instruction on the matter.

Denver also argues that the district court misled the jury by instructing it to consider the "substantially limited with respect to a major life activity" inquiry in two phases.[12] The district court followed the administrative regulations and

---

[12] In determining whether an ADA plaintiff is substantially limited in a major life activity, the jury should consider "(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *MacDonald v. Delta Air Lines, Inc.*,

instructed the jury to first determine whether plaintiffs were substantially limited with respect to a major life activity other than working. If the jury found plaintiffs were not so limited, the jury was to then consider whether plaintiffs were substantially limited with respect to working. *See* 29 C.F.R. pt. 1630, app. § 1630.2(j). Such an instruction sets forth a logical framework for the jury to consider working and other "major life activities" and the factors associated with each. The district court did not abuse its discretion in so instructing the jury.

**B.    Sufficiency of the Evidence**

We next turn to Denver's contention that insufficient evidence supported the jury's verdict. Denver asserts the evidence was insufficient to support the

---

94 F.3d 1437, 1444 (10th Cir. 1996) (quoting  29 C.F.R. § 1630.2 (j)(2)).  In determining whether such a plaintiff is substantially limited with respect to working, the jury should also consider these additional factors:

> (A) the geographical area to which the individual has reasonable access;
> (B) the job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or
> (C) the job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

*Bolton v. Scrivner, Inc.*, 36 F.3d 939, 943 (10th Cir. 1994) (quoting 29 C.F.R. §1630.2(j)(3)(ii)).

jury's findings that (1) plaintiffs were "qualified individuals with disabilities;"[13]

(2) plaintiffs were qualified for vacant positions within the Career Service; and

(3) reassignment of plaintiffs to Career Service positions would not constitute an

undue hardship on the city.  The United States and the private plaintiffs argue that

we cannot consider Denver's assertions on appeal because Denver did not move

for judgment as a matter of law at the close of all the evidence as required by Fed.

R. Civ. P. 50.  We agree.

At the close of plaintiffs' evidence, Denver moved for judgment as a matter

of law claiming that none of the plaintiffs had established they "are individuals

who are disabled."  Aplt. App. at 3664.  Specifically, Denver asserted plaintiffs

"ha[d] not established that there is a significant limitation on any major life

activity, and with respect to the issue of their qualifications, that the plaintiffs

have not established as a matter of law that any of the plaintiffs have met all of

the qualifications and requirements of the employer."  *Id.* at 3665.  Denver then

put on its defense, which included calling numerous witnesses.  At the close of all

---

[13]  Denver contends that because plaintiffs could not perform the essential
functions of the police officer position, the evidence was insufficient to prove an
ADA claim.  That arguments merely conflates a sufficiency of the evidence
question with the legal question of who is a "qualified individual with a
disability" under the ADA.  In essence Denver is arguing that in order to be a
qualified individual with a disability, a plaintiff must be able to perform the
essential functions of the job he or she holds.  We rejected that argument in Part
III.A.1 of this opinion.

the evidence, plaintiffs moved for judgment as a matter of law but Denver did not.

A failure to move for a directed verdict on a particular issue will bar appellate review of that issue. *See FDIC v. United Pac. Ins. Co.*, 20 F.3d 1070, 1076 (10th Cir. 1994) ("Defendant's failure to raise the bond coverage issue in its directed verdict motion precludes us from reviewing the sufficiency of the evidence to support the jury's bond coverage finding"); *Cleveland v. Piper Aircraft Corp.*, 890 F.2d 1540, 1551 (10th Cir. 1989) ("Failure to move for a directed verdict on this ground . . . precludes Defendant from challenging the sufficiency of the evidence of crashworthiness negligence on appeal."); *Firestone Tire & Rubber Co. v. Pearson*, 769 F.2d 1471, 1478 (10th Cir. 1985). Similarly, "[a]s a general rule, a defendant's motion for directed verdict made at the close of the plaintiff's evidence is deemed waived if not renewed at the close of all the evidence; failure to renew that motion bars consideration of a later motion for judgment n.o.v." *Karns v. Emerson Elec. Co.*, 817 F.2d 1452, 1455 (10th Cir. 1987) (citing cases). "Failure to renew the motion thus prevents a defendant from challenging the sufficiency of the evidence on appeal." *Id.*; *see also* 9A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2536 (2d ed. 1994) ("It is thoroughly established that the sufficiency of the evidence is not reviewable on appeal unless a motion for judgment as a matter of law was

made in the trial court. Indeed a motion at the close of plaintiff's case will not do unless it is renewed at the close of all the evidence.").

Denver did not move for judgment as a matter of law on whether plaintiffs were qualified for vacant positions at the close of the evidence, and never moved for judgment as a matter of law on the undue hardship issue. Denver does not contend otherwise, nor does it claim that it should be excepted from the general rule precluding appellate review. We therefore decline to consider its sufficiency of evidence claims.

**C.    Evidentiary Issues**

Denver asserts the district court erred in four of its evidentiary and discovery rulings. Specifically, Denver contests (1) the district court's prohibition of the term "affirmative action" and like phrases at trial; (2) the introduction of one of Denver's responses to a request for an admission; (3) the admission of Dr. Kleen's testimony; and (4) the denial of Denver's motion to extend expert witness discovery and for examination of plaintiffs pursuant to Fed. R. Civ. P. 35. We review a district court's evidentiary rulings and rulings on motions in limine for an abuse of discretion. *See McCue v. Kansas Dept. of Human Resources*, 165 F.3d 784, 788 (10th Cir. 1999); *Den Hartog v. Wasatch Academy*, 129 F.3d 1076, 1092 (10th Cir. 1997). We review de novo a district court's interpretation of the Federal Rules of Evidence. *See Reeder v. American*

-34-

*Econ. Ins. Co.*, 88 F.3d 892, 894 (10th Cir. 1996).

### 1. *Prohibition on "Affirmative Action" and Like Terms*

We first address whether the district court erred in granting plaintiffs' motion in limine prohibiting Denver from using terms like "affirmative action," "special rights," and "preferences." In granting that motion, the district court stated, "[w]ith regard to the issues of defendants using language at trial that plaintiffs were seeking preferences or affirmative action or special rights, defendants are precluded from using such language because it would simply muddy the waters and obfuscate the issues, and its prejudicial effect might outweigh its probative value." Aplt. App. at 2767. On appeal, Denver does not deny that such language would have "mudd[ied] the water" or "obfuscate[d] the issue." Instead, Denver contends the district court's ruling was incorrect because it was based on the court's erroneous legal interpretation that ADA requires something beyond equal treatment of disabled and nondisabled employees.

As noted above, Denver's interpretation of the ADA is incorrect. Denver again "erroneously conflates 'affirmative action' with the statutory definition of discrimination." *Smith*, 180 F.3d at 1167. Such "labels cannot substitute for Congress' statutory mandate in the ADA." *Id.* Congress included "reassignment to a vacant position" in its definition of "reasonable accommodation," and legislated that the "failure reasonably to accommodate

-35-

(including reassignment) [is] a prohibited act of discrimination." *Id.* The legal underpinnings of the district court's ruling were sound because, as we held in *Smith*, we view plaintiffs' request for reassignment as a reasonable accommodation and not "affirmative action."[14]

Moreover, the district court's ruling did not inhibit Denver from invoking phrases almost identical to those prohibited, as well as other language that conveyed the same message. Throughout the trial, Denver's attorneys and witnesses discussed their reluctance to give "preferences," Aplt. App. at 3466; *see also id.* at 3429, 3600, or jobs based "on status," *id.* at 2849, 3436, and the importance of maintaining "a level playing field," *id.* at 2940, 2942, 3848; *see also id.* at 3846. Denver emphasized that plaintiffs wanted "better treatment," than others, *id.* at 3747, and were "seeking . . . an advantage," *id.* at 3839. In closing argument Denver explained "this case is about . . . the plaintiffs wanting an advantage with respect to a job in the City and County of Denver, and that . . .

---

[14] The use of the term "affirmative action" in the disability context is somewhat misleading. While reasonable accommodation requires some affirmative act on the part of the employer, the Supreme Court distinguishes between acts that constitute reasonable accommodations and those acts that fundamentally alter the nature of a program, which it terms "affirmative action." *See Alexander v. Choate*, 469 U.S. 287, 300 n.20 (1985). To further confuse the matter, this differs from the definition of affirmative action as "a remedial policy for the victims of past discrimination." *Id.* The phrase is thus of little use in analyzing the ADA. Instead it provides a conclusory (and politically loaded) description of a requested accommodation.

advantage is a disadvantage to the rest of the employees in the Career Service of the City and County of Denver." *Id.* at 3834. Under such circumstances, any possible error in the district court's ruling is harmless.

### 2. *Stipulation Regarding Discovery Responses*

Denver contends the district court erred in refusing to allow it to withdraw a stipulation to the admissibility and authenticity of its discovery responses which, it claims, contained a typographical error. "District courts . . . are vested with broad discretion in determining whether to hold a party to a stipulation or whether the interests of justice require that the stipulation be set aside." *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1098 (10th Cir. 1991).

Plaintiffs' request for admission stated, "Admit you contend that . . . police officers with disabilities who cannot make a forcible arrest or shoot a firearm are not qualified individuals with disabilities as defined under the ADA." Aplt. App. at 506. Denver responded, "deny. . . . Defendants contend that police officers who cannot make a forcible arrest and/or shoot a firearm are qualified individuals with a disability as defined under the ADA." *Id.* It is not entirely clear that Denver's response contains a "typographical" error as it twice affirms that plaintiffs are qualified individuals with disabilities. Nevertheless, Denver used the ample opportunity it had both at pretrial and at trial to contest whether plaintiffs were qualified individuals with disabilities and to explain to the jury

-37-

that the response was inaccurate. Moreover, the district court did not instruct the jury to give any special weight to the admission. *See Keen v. Detroit Diesel Allison*, 569 F.2d 547, 553-54 (10th Cir. 1978). The court was well within its discretion in refusing to allow Denver to withdraw its stipulation to this discovery response.

### 3. *Testimony of Dr. Kleen*

Denver complains that Dr. Kleen, Mr. Davoll's treating physician, was actually an undisclosed expert whose testimony fell within the parameters of Fed. R. Evid. 702. It asserts the district court erred in admitting Dr. Kleen's testimony because it went beyond the scope of his treatment of Mr. Davoll, and because plaintiffs did not properly disclose him as an expert pursuant to Fed. R. Civ. P. 26(a)(2), which requires a party to disclose the identity of an expert and the expert to provide a written report. Plaintiffs and the United States contend that Dr. Kleen testified as a lay witness.

A treating physician is not considered an expert witness if he or she testifies about observations based on personal knowledge, including the treatment of the party. *See Richardson v. Consolidated Rail Corp.*, 17 F.3d 213, 218 (7th Cir. 1994); *see also* FED. R. CIV. P. 26(a)(2) advisory committee's note (1998) (distinguishing between treating physicians and retained experts); *cf. Patel v. Gayes*, 984 F.2d 214, 218 (7th Cir. 1992) (treating physicians' opinions on

industry standard of care constituted classic expert testimony). A treating physician, even when testifying as a lay witness, may state "expert" facts to the jury in order to explain his testimony. *See* 4 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 701.08 (Joseph M. McLaughlin ed., 2d ed. 1999) (noting that a doctor testifying as a lay witness should be given "loose rein to state what are truly facts, even if they are 'expert' facts"). In addition, "a lay witness may testify as to any opinion '(a) rationally based on the perception of the witness and (b) helpful to a clear understanding . . . of a fact in issue.'" *Weese v. Schukman*, 98 F.3d 542, 550 (10th Cir. 1996) (quoting FED. R. EVID. 701). In *Weese*, we noted that, in accordance with Rule 701, "any opinions offered by [a lay witness doctor] were based on his experience as a physician and were clearly helpful to an understanding of his decision making process in the situation." *Id.*

In the present case, Dr. Kleen testified as a lay witness who had treated Mr. Davoll. While he did explain various medical terminology and drew a diagram explaining Mr. Davoll's injury, those actions do not render Dr. Kleen an expert witness. His factual explanations of terms like "rehabilitation," "modality," and "soft tissue injury," as well as the diagram explaining Mr. Davoll's injuries, clarified his testimony on his treatment of Mr. Davoll and did not constitute opinion testimony.

Denver's two specific objections to Dr. Kleen's testimony are similarly without merit.[15] Denver objected to questioning it contends emphasized Dr. Kleen's background, and to his assessment of Mr. Davoll's psychological state. *See* Aplt. Br., Attachments I & J. With respect to the former, the questioning was cursory, eliciting that Dr. Kleen was licensed to practice in Colorado, received his medical degree from the University of Minnesota, and specialized in physical medicine and rehabilitation. He was not questioned about his curriculum vitae, his prior experience, or his publications. The questioning on his background was comparable to (and in some cases less than) that of the other lay witnesses at trial. With respect to the "psychological impairment" testimony, *see* Aplt. Br. at 28, Dr. Kleen simply stated that, based on his interactions with Mr. Davoll, he understood that Mr. Davoll was suffering from psychological stress because Denver was "pressuring him to retire." Aplt. App. at 3090. Dr. Kleen did not attempt to name a particular psychological disorder or give an in-depth analysis as to Mr. Davoll's mental health. He simply stated, as did Mrs. Davoll, that the retirement proceedings caused Mr. Davoll stress. *Cf. id.* at 3168, 3170-71 (Mrs. Davoll's

[15] On appeal, Denver also contends that Dr. Kleen testified with respect to specific ADA terminology. Denver provides no record cite and we have found no such testimony. We also note that Denver questioned Dr. Kleen at length about the general physical abilities of "the average American." Aplt. App. at 3116. Dr. Kleen replied that "a patient should be able to walk, talk, eat, sit, stand . . . without physical help." *Id.* at 3117. Denver cannot now complain about Dr. Kleen's responsive answers to its questioning.

-40-

testimony regarding the effect of the forced retirement on Mr. Davoll's mental state). That conclusion is within the province of a lay witness such as Dr. Kleen who has personal knowledge of the situation. *See United States v. Anthony*, 944 F.2d 780, 782-83 (10th Cir. 1991) (lay witnesses may testify as to the sanity or insanity of a person if the witness' relationship with that person is of sufficient intimacy and duration); *see also United States v. Garcia*, 994 F.2d 1499, 1506 (10th Cir. 1993) ("[T]he first hand knowledge requirement may be based on the lay witness' perception of otherwise inadmissible out of court statements.").

4.      ***Denial of Motion to Extend Expert Witness Discovery and Examine Plaintiffs***

Denver argues that the district court erred in refusing to extend the time allowed for expert witness discovery and for Fed. R. Civ. P. 35 discovery. We review discovery rulings for an abuse of discretion. *See Cole v. Ruidoso Mun. Schs.*, 43 F.3d 1373, 1386 (10th Cir. 1994). "[W]e will not reverse a decision to limit discovery 'absent a clear showing that the denial of discovery resulted in actual and substantial prejudice to the complaining litigant.'" *Gile v. United Airlines, Inc.*, 95 F.3d 492, 495 (7th Cir. 1996) (quoting *Searls v. Glasser*, 64 F.3d 1061, 1068 (7th Cir. 1995)).

The district court's decisions do not appear to be an abuse of discretion.[16]

_____

[16] Denver relies on *Summers v. Missouri Pac. R.R. Sys.*, 132 F.3d 599 (10th Cir. 1997), in pursuing this claim. *Summers* is distinguishable. The plaintiffs

Even assuming arguendo the court's denial of Denver's motion was in error, reversal is clearly not required. After the district court consolidated the United States' case with that of the private plaintiffs, Denver had an opportunity to cure any prejudice flowing from the court's original rulings but failed to take advantage of it. First, Denver expressly disavowed any desire to conduct a physical examination of plaintiffs. The magistrate judge specifically asked, "Am I correct now that you don't want a medical examination, or you do want a medical examination?" Aplt. App. at 2710. Denver's counsel replied, "We do not." *Id.* at 2711. Similarly, the district court gave Denver additional time to designate a vocational rehabilitation expert but Denver declined the opportunity. Denver may not now claim prejudice from the pre-trial ruling when it had a chance to cure precisely the prejudice it allegedly suffered and chose not to. *Cf. Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999) (appellant failed to take advantage of opportunity to cross-examine witness giving undisclosed testimony outside the presence of the jury); *Real v. Hogan*, 828 F.2d 58, 63 (1st Cir. 1987) (appellant failed to show up for

there had no opportunity to cure the prejudice flowing from the district court's decision. Also, the *Summers* plaintiffs had a strong reason for needing an extension of time – the district court chose to exclude the plaintiffs' designated experts. *See id.* at 605 ("[T]his dispute presents unique facts that demand reversal."). Here, the reason Denver did not act within the confines of the scheduling order is unclear.

Rule 35 examinations and then attempted to vacate trial date so he could be examined).

**D.  Remedies**

We turn to the appeal and cross-appeal of the remedies awarded to plaintiffs.  Denver appeals the district court's denial of its request for an evidentiary hearing on equitable relief.  Plaintiffs cross-appeal, contesting the district court's decision to limit their front-pay awards to two years after the judgment instead of awarding front pay for their full work-life expectancies.  We review for an abuse of discretion the district court's refusal to hold an evidentiary hearing on equitable relief, *cf. FDIC v. Daily*, 973 F.2d 1525, 1532 (10th Cir. 1992), and the court's award of equitable remedies, *see Roberts v. Colorado State Bd. of Agric.*, 998 F.2d 824, 826 (10th Cir. 1993).

**1.  Compensatory Damages**

Denver contends the district court erred in failing to instruct the jury that Title II provides for compensatory damages only upon a showing of intentional discrimination.  Plaintiffs and the United States claim Denver failed to raise this issue below in the manner required by Fed. R. Civ. P. 51.  We agree.

The rule provides that "[n]o party may assign as error the giving or the failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict, *stating distinctly the matter objected to and the*

*grounds of the objection.*" FED. R. CIV. P. 51. (emphasis added). "Because the purpose of the objection is to give the court an opportunity to correct any mistake before the jury enters deliberations . . . an excessively vague or general objection to the propriety of a given instruction is insufficient to preserve the issue for appeal." *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 553 (10th Cir. 1999) (citation omitted); *see also Tele-Communications, Inc. v. Commissioner*, 104 F.3d 1229, 1233 (10th Cir. 1997); *Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1514 (10th Cir. 1984).

In its reply brief, Denver claims that it properly objected to the jury instructions on compensatory damages and the district court ruled against it; that even if it did not properly object, it was excused from doing so because the district court was aware of its position and further objection would have been futile; and even if it was not excused from objecting, the exclusion of the word "intentional" from the instruction constituted plain error. We consider each contention in turn.

Denver claims it objected to the omission of the word "intentional" in the first set of plaintiffs' jury instructions on compensatory damages. There Denver wrote, "[d]efendants object to the omission of the work [sic] 'intentional' as all plaintiffs must in the end prove intentional discrimination. *St. Mary's Honor Center v. Hicks*, 113 S. Ct. 2742, 2747-49 (1993)." Aplt. App. at 1408j. The

language of that objection is somewhat vague – it is unclear whether Denver was claiming that plaintiffs must prove intentional discrimination to hold the City liable or to merit an award of compensatory damages. The cite to *Hicks* helps clarify the matter, however. On the pages cited and indeed in the whole opinion, the Court discusses a Title VII plaintiff's ultimate burden of persuasion that the defendant engaged in intentional discrimination. *See Hicks*, 509 U.S. 502, 506-511 (1993). The case is not about compensatory damages, and there is simply no discussion of damages on the cited pages. Thus, Denver's objection appears to go to liability and therefore only indirectly to damages.

Similarly, the district court's ruling cited by Denver as deciding this issue against it also concerns intent as an element of liability, not as an element of compensatory damages. In a hearing on the first set of instructions tendered by plaintiffs and defendants, the district court rejected all proposed instructions because they were too long, were confusing, and with respect to defendant's instructions disregarded the summary judgment rulings. The court specifically pointed out proposed instructions that conflicted with its previous rulings and said at one point, "I have ruled that . . . plaintiffs do not have to prove intent in this kind of case." Aplt. App. at 2738. Denver relies on this language to argue the district court ruled against its compensatory damage objection. However, the court had not made any previous rulings on compensatory damages; it had only

-45-

ruled on when a failure to accommodate constitutes discrimination under the ADA. *See Davoll*, 943 F. Supp. at 1300-01. The district court's statement, in context, does not support Denver's assertion that it properly objected to the compensatory damage instruction and that its objection was overruled.

More importantly, when the district court rejected the parties "137 pages" of proposed instructions, Aplt. App. at 2734, the court made it very clear that it expected the parties to redraft the instructions *in toto* and thereafter to make their objections thereto. After giving the parties some sample instructions, the court concluded by saying:

> Please don't try and argue your case in the instructions. And here's what I want you to do. Look at the ones I gave you. See how those were done. Get the plaintiffs to make their agreements on what they're going to offer, and submit those to the defense. *The defense can itemize whatever objections the defense wants to make to those instructions and can tender a responsive objection in addition to this, which is part of your record, to those instructions.*

*Id.* at 2741 (emphasis added). We thus reject Denver's contention that it was excused from objecting when the second set of jury instructions were tendered. *Cf. Gardner v. Chrysler Corp.*, 89 F.3d 729, 736 n.4 (10th Cir. 1996).

Because Denver did not distinctly state "the matter objected to and the grounds of the objection," FED. R. CIV. P. 51, we review for plain error the court's instruction on compensatory damages. *See Russell v. Plano Bank & Trust,* 130 F.3d 715, 718-19 (10th Cir. 1997), *cert. denied*, 118 S. Ct. 1801 (1998);

*Cartier v. Jackson*, 59 F.3d 1046, 1050 (10th Cir. 1995). "To constitute plain error, the district court's mistake must have been both obvious and substantial." *Id.*

When the district court gave the contested instruction in late 1996, the law was unsettled as to whether Title II plaintiffs had to prove intentional discrimination to merit an award of compensatory damages. *Compare Alexander v. Choate*, 469 U.S. 287, 299 (1985) ("[T]here is reason to question whether Congress intended § 504 to reach only intentional discrimination."), *W.B. v. Matula*, 67 F.3d 484, 492, 494 (3d Cir. 1995) (finding compensatory damages are available under section 504 of the Rehabilitation Act without explicitly limiting such damages to intentional violations), *Rodgers v. Magnet Cove Pub. Schs.*, 34 F.3d 642, 644-45 (8th Cir. 1994) (same), *Tyler v. City of Manhattan*, 118 F.3d 1400, 1407 (10th Cir. 1997) (Jenkins, J., dissenting) ("[R]ecent cases . . . suggest that in the specific context of Title II of the ADA, the compensatory damages remedy may not depend on proof of intentional discrimination."), *and Niece v. Fitzner*, 922 F. Supp. 1208, 1219 & n.9 (E.D. Mich. 1996) (noting, without deciding, that some cases have held a showing of intent is required to recover compensatory damages under the ADA and Rehabilitation Act), *with Wood v. President and Trustees of Spring Hill College*, 978 F.2d 1214, 1219 (11th Cir. 1992) (requiring intentional discrimination for compensatory damages under

section 504), *and Tyler v. City of Mahattan*, 849 F. Supp. 1442, 1444 (D. Kan. 1994) (requiring showing of intentional discrimination under Title II of the ADA), *aff'd on other grounds*, 118 F.3d 1400. When the law is unsettled, the decision to instruct one way or the other does not constitute plain error.[17] *See Heath v. Suzuki Motor Corp.*, 126 F.3d 1391, 1394 (11th Cir. 1997). Such was the case here.

Moreover, there is another argument to support the district court's instruction. The Supreme Court has recognized the proposition that statutes enacted by Congress pursuant to its spending power should not expose funding recipients to compensatory damages liability for unintentional violations. *See Franklin v. Gwinnet*, 503 U.S. 60, 74 (1992) ("[T]he point of not permitting monetary damages for an unintentional violation is that the receiving entity of federal funds lacks notice that it will be liable for a monetary award.");

---

[17] We recognize this court has recently held that "entitlement to compensatory damages under section 504 of the Rehabilitation Act requires proof the defendant has intentionally discriminated against the plaintiff." *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir. 1999). Although supportive of Denver's legal argument, the district court did not have the benefit of this case when instructing the jury and any alleged error was therefore not "obvious" at the time. *Cf. United States v. McVeigh*, 153 F.3d 1166, 1219 n.46 (10th Cir. 1998) Moreover, plaintiffs did allege in their complaint that "[d]efendants actions are intentional and in reckless disregard of the federally protected civil rights of plaintiffs." Aplt. App at 13. Denver's failure to properly object to the damages instruction denied plaintiffs and the court the opportunity to cure any error.

*Guardians Ass'n et al. v. Civil Serv. Comm'n*, 463 U.S. 582, 597 (1983) (Remedies to enforce spending power statutes must respect the privilege of the recipient of federal funds to withdraw and terminate its receipt of federal money."). Unlike the Rehabilitation Act, which was enacted under the Spending Clause, the ADA was enacted under the Commerce Clause and the Fourteenth Amendment. 42 U.S.C. § 1210(b)(4). Title II entities are not necessarily recipients of federal funds, and the arguments against liability for compensatory damages absent intent are arguably less relevant. One could therefore contend that intent should not be required for Title II violations, even if it is required for Rehabilitation Act violations. *See Ferguson v. City of Phoenix*, 157 F.3d 668, 678 (9th Cir. 1998) (Tashima, J., dissenting); *Tyler*, 118 F.3d at 1414-15 (Jenkins, J., dissenting). We do not pass on the merits of this argument, but simply note it strengthens our conclusion that the instruction here was a plausible interpretation of the law and thus did not constitute plain error.

## 2. Request for Hearing on Evidentiary Relief

Denver contends the district court abused its discretion in refusing to set a three-day evidentiary hearing on the appropriate front-pay and back-pay awards, which it requested after the post-trial status conference. Denver took issue with plaintiffs' effort at mitigation as well as the salary level used to calculate the awards and requested a hearing to challenge plaintiffs' evidence. In its order

regarding equitable relief, the district court noted that "[w]ithout reserving the right to request an evidentiary hearing, defense counsel agreed at the December 11, 1996 status conference that the equitable relief issues would be addressed on the basis of the parties' written submissions." *Davoll v. Webb*, 968 F. Supp. 549, 553 (D.Colo. 1997). Moreover, the court pointed out that Denver could have presented evidence relating to these issues at trial as it had much of the relevant information pretrial, or it could have attached offers of proof to its brief to show a need for a hearing. Both plaintiffs and the United States had appended considerable evidence concerning the appropriate equitable relief to their memoranda. The district court denied Denver's request as it "ha[d] made no showing that a hearing is justified nor that it would change the outcome concerning the equitable relief issues." *Id.*

For the first time in its reply brief, Denver argues that it agreed to resolve by written submission only the issue of Mr. Davoll's back pay, not other equitable relief issues. While a few lines of the transcript discussing equitable relief are marginally ambiguous,[18] the record as a whole belies Denver's contention. In

---

[18]  At a post-trial status conference in which all parties were participating, the district court asked, "[W]hat do you want to do on the equitable relief issues? Do you want to argue those? Do you want to have a hearing? Do you want me to make a ruling? What?"

Counsel for the United States replied, "Your Honor, as far as Mr. Davoll goes, the United States believes we can file a written submission on the back pay calculation. We have already submitted to defendants an estimate of the back pay

Denver's Memorandum of Law on equitable relief, nowhere did it represent it was arguing Mr. Davoll's back pay award separately from his front-pay award or from the relief to Ms. Clair and Mr. Escobedo. Moreover, Denver contested Mr. Davoll's back pay award but attached no supporting materials, even though it concedes it agreed to decide this issue on written submissions. Finally, we note that the district court, plaintiffs, and the United States all clearly understood the case would be decided on written submissions, as evidenced by the court's opinion and the parties' lengthy attachments to their motions. Denver received the other parties' motions and attachments almost a month before it submitted its own. Denver's belated argument that it did not agree to have equitable relief decided on written motions appears to be little more than a disingenuous attempt to use a barely-ambiguous record to shield itself from the consequences of its inaction.

---

calculations."

The court agreed, "It really shouldn't require a hearing to figure out something that's going to be determined by the City's accounting facility, I should think."

Counsel for Denver responded, "That is correct, Your Honor. Your Honor, what I will propose on that issue is that if they will make a submission to you in writing, we will make one in response."

The court and the parties then discussed a briefing schedule. When the court decided to give the parties extra time, plaintiffs' counsel said, "We appreciate that," indicating the understanding that all plaintiffs were included in the briefing discussion. Aplt. App. at 1320-21.

Denver also claims it was prejudiced by its inability to cross-examine Dr. Vogenthaler, plaintiffs' vocational expert. Denver did not depose Dr. Vogenthaler although it had the opportunity, and did not designate its own vocational expert. Denver submitted no evidence to respond to plaintiffs' economic figures. Denver's inaction is the source of any prejudice it suffered. *Cf. Woodworker's Supply, Inc.*, 170 F.3d at 993; *Real*, 828 F.2d at 63. The district court was within its discretion to deny an evidentiary hearing when the parties had agreed otherwise and Denver offered no proof that such a hearing was justified.

## 3. Front Pay Limitation

On cross-appeal, plaintiffs contend the district court abused its discretion by awarding front pay to plaintiffs for only two years.[19] We recognize that "determining a front pay award requires the district court to predict future events and consider many complicated and interlocking factors," and we therefore review for an abuse of discretion. *Mason v. Oklahoma Turnpike Auth.*, 115 F.3d 1442, 1458 (10th Cir. 1997). That discretion, however, should be measured against an anti-discrimination statute's purpose to make the plaintiffs "whole". *See Carter*

---

[19] Although reinstatement is the preferred remedy under the ADA, *see Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1, 19 (1st Cir. 1999), front pay may be awarded instead when appropriate, *see Fitzgerald v. Sirloin Stockade, Inc.*, 624 F.2d 945, 957 (10th Cir. 1980). Neither party appeals the district court's decision to award front pay.

*v. Sedgwick County, Kan.*, 36 F.3d 952, 957 (10th Cir. 1994); *Pitre v. Western Elec. Co.*, 975 F.2d 700, 704 (10th Cir. 1992).  A front-pay award must specify an end date and take into account any amounts that plaintiffs could earn using reasonable efforts.  *Carter v. Sedgwick County, Kan.*, 929 F.2d 1501, 1505 (10th Cir. 1991).  Although the cut-off date is within the district court's discretion, that determination "must be based on 'more than mere guesswork.'" *Id.* (citing *Shore v. Federal Express Corp.*, 777 F.2d 1155, 1160 (6th Cir. 1985)).  *Cf. Albemarle Paper Co. v. Moody*, 422 U.S. 405, 416 (1975) ("That the court's discretion [to award Title VII back pay] is equitable in nature . . . hardly means that it is unfettered by meaningful standards or shielded from thorough appellate review." ).  The district court may consider all evidence presented at trial in formulating the proper award.  *See EEOC v. General Lines, Inc.*, 865 F.2d 1555, 1562 (10th Cir. 1989) .

Numerous factors are relevant in assessing front pay including work life expectancy, salary and benefits at the time of termination, any potential increase in salary through regular promotions and cost of living adjustment, the reasonable availability of other work opportunities, the period within which a plaintiff may become re-employed with reasonable efforts, and methods to discount any award to net present value.  *Shore*, 777 F.2d at 1160.  A court may also consider a plaintiff's future in the position from which he was terminated.  *See Suggs v.*

*Servicemaster Educ. Food Mgmt.*, 72 F.3d 1228, 1234 (6th Cir. 1996). A front pay award should reflect the individualized circumstances of the plaintiff and the employer.

Here, plaintiffs submitted vocational economic assessment reports by an expert, Dr. Vogenthaler, who took into account each plaintiff's educational level, disability, age, and gender to determine his or her work life expectancy and earning capacity. He then looked at how much each plaintiff would have earned had he or she been reassigned to a city government position for which he or she was qualified, since those positions pay considerably more than non-city jobs. He took the difference between the annual city salaries and the annual projected future earnings for each plaintiff, accounting for cost of living and merit increases, to determine the amount of front pay each plaintiff deserved per year. This method accounts for one's duty to mitigate damages because a plaintiff will receive only the difference between the city salary and his or her earning capacity, not what he or she actually earns. *Cf. Shore v. Federal Express Corp.*, 42 F.3d 373, 378-79 (6th Cir. 1994). The trial record supported Dr. Vogenthaler's contention that non-city employment paid less than city employment. For example, at the time of trial in late 1996, after a lengthy and extensive job hunt Mr. Davoll had a job that paid $24,000 a year, and Mr. Escobedo earned $8.50 per hour. Had Mr. Davoll been reassigned to a city position for which he was

qualified, his salary and benefits for 1997 would have been worth over $56,000; Mr. Escobedo's salary and benefits would have been worth over $51,000. Denver presented no evidence to counter Dr. Vogenthaler's assessment.

The district court correctly stated the law on assessing front pay awards. The court then stated, "an award of front pay to each Private Plaintiff in the amount calculated by Dr. Vogenthaler from 1997 through 1999, a period of two years, will allow each a reasonable amount of time to find comparable employment." *Id.* at 1375. The court did not explain on what evidence it based this finding, but instead cited to two cases which awarded front pay for a two-year period, *Dominic v. Consolidated Edison Co.*, 822 F.2d 1249, 1258 (2d Cir. 1987), and *Reeder-Baker v. Lincoln Nat'l Corp.*, 649 F. Supp. 647, 662 (N.D. Ind. 1986). Those cases do not explain to us why the district court chose a two-year limitation here. In *Reeder-Baker,* the court specifically looked to the difference between the plaintiff's present and former salaries – $13,380 annually – to arrive at a "conservative estimate of the time needed" to make her whole. 649 F. Supp. at 664. In *Dominic*, the appeals court relied on the district court's determination that two years was a sufficient amount of time for the plaintiff, who was 52 and had a Master's and a law degree, to receive front pay. *See* 822 F.2d at 1256-59 (referring to district court's assessment of front pay amount and duration). In so finding, the district court had emphasized that three years had passed since the

plaintiff's discharge, during which time he had found a new (albeit lower-paying job), and that his "prospects of obtaining a more lucrative position are good given his academic credentials and his relative youth." *Dominic v. Consolidated Edison Co.*, 652 F. Supp. 815, 820 (S.D.N.Y. 1986).

Because the purpose of front pay is to make each plaintiff whole, the district court must look at the individualized circumstances of each plaintiff. A flat rule awarding front pay for a specific period, no matter how long or short, would defeat the purpose of the award. It is unclear here why the district court thought a two year front pay award would adequately compensate plaintiffs; the record does not appear to support that assessment. *See Carter*, 36 F.3d at 957. We do not specify an appropriate time for the award nor do we hold that two years is definitely inappropriate in these cases. We do, however, require the district court to show the end date is based on more than "mere guesswork." *See Carter*, 929 F.2d at 1505. We therefore reverse and remand the front pay award and instruct the district court to articulate the specific bases for the end date for each plaintiff, taking into consideration the factors we have outlined above.

**E.  Equal Protection Claim**

The district court granted Denver's motion for summary judgment on plaintiffs' equal protection claim. *Davoll v. Webb*, 943 F. Supp. at 1303-04. We review the grant of summary judgment de novo, viewing the evidence in the light

most favorable to the party against whom summary judgment was entered. *Smith*, 180 F.3d at 1159-60.

Plaintiffs claim that Denver violated their equal protection rights by "allowing some police officers with disabilities as or more severe than Plaintiffs' to remain as commissioned police officers, while terminating Plaintiffs, and by affording other City employees the opportunity of reassignment to vacant positions, but denying this right to the Plaintiffs." Aplee. Br. at 48. They also assert that the disabled should be considered a suspect class and that Denver's policies should therefore be subject to heightened scrutiny.

"Although protected by statutory enactments such as the Americans with Disabilities Act, the disabled do not constitute a 'suspect class' for purpose of equal protection analysis." *Hansen v. Rimel*, 104 F.3d 189, 190 n.3 (8th Cir. 1997); *see also Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 442-46 (1985); *Does 1-5 v. Chandler*, 83 F.3d 1150, 1155 (9th Cir. 1996); *Welsh v. City of Tulsa*, 977 F.2d 1415, 1420 (10th Cir. 1992). We therefore apply the rational basis test, upholding the policy "if there is 'any reasonably conceivable state of facts that could provide a rational basis for the qualification.'" *Spragens v. Shalala*, 36 F.3d 947, 951 n.3 (10th Cir. 1994).

We first consider plaintiffs' argument that Denver's decision to permit some disabled police officers to stay on the force while terminating others

violates their equal protection rights. In the 1980s, the DPD required every police officer, regardless of actual job duties, to be able to fire a gun and effect a forcible arrest. Plaintiffs argue that this policy has not been consistently enforced among disabled police officers. The record indicates that DPD would place its officers on medical leave or light duty work after a physician notified the department that an officer could not perform the essential functions of the job. Admittedly there were officers whose physical appearance would make one doubt whether they could actually perform the essential functions of the job. However, no doctor had notified the DPD that these officers were unable to perform their duties. It is rational for Denver to wait for notice from a doctor instead of assessing limitations based on physical appearance. Thus, this disparate treatment withstands rationality review.

We next consider Denver's policy which forbids transfer between the Career and Classified Service. The two systems have separate testing procedures and different pay scales and benefits. Keeping the systems separate could conceivably provide administrative ease, a reason sufficient to withstand rationality review. This, of course, does not mean that Denver's policy is lawful: it simply means it is not unconstitutional. *Cf. Welsh*, 977 F.2d at 1420 & n.3 (noting that a decision which withstands rationality review could nevertheless violate the Rehabilitation Act).

**F. Class Certification**

Plaintiffs also cross-appeal the district court's denial of their motion for class certification. Plaintiffs proposed a class action on behalf of the following:

> [F]ormer, present and future members of the Denver Police Department who have or will have disabilities; who have been or will be denied reasonable accommodation of their disabilities by defendants and aggrieved by defendants' ongoing failure to implement the provisions of the ADA for Denver Police Officers; who have been or will be denied equal protection and due process through defendants' ongoing disparate treatment of employees with disabilities and termination and constructive discharge of persons with disabilities.

Aplt. App. at 6-7. When they moved for class certification, plaintiffs also requested a bifurcated trial so the court could first adjudicate the legality of Denver's no-reassignment policy and then assess individualized relief. The district court considered whether the class description was "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Davoll v. Webb*, 160 F.R.D. 142, 144 (D.Colo. 1995). According to the court, the individualized consideration required to determine whether each class member was disabled under the ADA rendered the proposed definition "untenable." *Id.* at 146.

"[T]he district court has broad discretion to determine whether the class description is sufficiently definite." 5 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 23.21 [5] at 23-61 (3d ed. 1999). If the court finds that the

proposed definition is not sufficiently definite, it may modify the definition

instead of dismissing the proposed action. *Id.* § 23-21[7] at 23-62.2. Generally

speaking,

> [t]he discretion granted to the trial court on the certification issue
> leaves the decision as to what method of trial is most efficient
> primarily to the court that is in the best position to determine the
> facts of the case, to appreciate the consequences of alternative
> methods of resolving the issues of the case and that is in the best
> position to select the most efficient method for their resolution.

*Boughton v. Cotter Corp.*, 65 F.3d 823, 826 (10th Cir. 1995).

We are persuaded the district court acted within its discretion. The

proposed class description defined its membership in part as those police officers

who were disabled, as defined by the ADA. The district court would have had to

conduct individualized inquiries to determine whether a potential class member

met the statutory definition. *See Sutton v. United Air Lines*, 119 S. Ct. 2139,

2147 (1999). As the district court noted, even the named plaintiffs' affidavits in

support of the class certification motion did not allege that they met the ADA

definition of "disability." Under these circumstances, it was within the district

court's discretion to decide that determining class membership under the proposed

definition would be administratively infeasible.[20] *Cf. Chandler v. City of Dallas*,

---

[20] We understand plaintiffs' concern that by denying their class certification motion and upholding the United States pattern and practice action, this decision may be interpreted as holding that only the government can bring a class-wide ADA employment suit. Such an interpretation would be unfounded.

2 F.3d 1385, 1396 (5th Cir. 1993).

## G. Pattern and Practice Suit

The United States brought a pattern and practice action alleging Denver "ha[s] pursued and continue[s] to pursue policies and practices that discriminate in employment on the basis of disability" in violation of the ADA. The district court bifurcated the action into a "liability phase" to determine whether Denver's policy comported with the ADA, and a "remedial phase" to determine whether there were any qualified individuals with disabilities who merited relief. About a month before trial, the district court granted summary judgment on the question of liability in favor of the United States. The court held Denver's policy forbidding reassignment of disabled police officers to Career Service positions violated the ADA, and that Denver "failed to produce evidence from which a reasonable trier of fact could find that accommodating such individuals would cause it an undue hardship." *United States v. City & County of Denver*, 943 F. Supp. 1304, 1313 (D. Colo. 1996). The court later certified this summary judgment order for

---

Given the deferential standard by which we review class certification, it is possible the district court could have certified the class in its discretion, or could have modified the proposed definition so that it was sufficiently definite. Of course, we do not decide those questions as our holding here is limited to the issue directly before us.

At the same time, we do note that a pattern and practice action brought by the United States pursuant to section 707 of Title VII, 42 U.S.C. § 2000e-6, is not subject to the requirements of Fed. R. Civ. P. 23. *See General Tel. Co v. EEOC*, 446 U.S. 318, 327 & n.9 (1980).

interlocutory appeal pursuant to 28 U.S.C § 1292(b).

Denver raises several issues in this interlocutory appeal. First, it argues that the United States has not properly brought an ADA pattern and practice suit because it followed the framework of *International Bhd. of Teamsters,* 431 U.S. 324 (1977), a systemic disparate treatment Title VII case, and not the test set forth in *White v. York Int'l Corp.*, 45 F.3d 357 (10th Cir. 1995), an ADA case. Denver also asserts that the *Teamsters* framework is inapposite because Denver applies its policy neutrally, that reassignment is never a required reasonable accommodation,[21] and that requiring reassignment here would constitute an undue hardship. Finally, Denver requests that we address the necessary elements of the remedial phase.

Title I of the ADA adopts the powers, remedies, and procedures set forth in Title VII. *See* 42 U.S.C. § 12117(a). Section 707 of Title VII states

> [w]henever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any . . . [protected] rights . . . and that the pattern or practice is of such a nature and is intended to deny the full exercise of the [protected] rights . . ., the Attorney General may bring a civil action.

42 U.S.C. § 2000e-6(a). The United States brought this pattern and practice action pursuant to this subsection, as it is authorized to do under Title I.

---

[21] We rejected this claim *supra* in part III A.2.

In *Teamsters*, the Supreme Court addressed, inter alia, the proper structure for a pattern and practice case brought by the government. *See* 431 U.S. at 357-62. The defendant there argued that in order to maintain a pattern and practice action, the United States should have to prove each element of the *McDonnell Douglas* test, which sets forth the burden for an individual prima facie case under Title VII. *See id.* at 357. The Court rejected this contention. It ruled that in a pattern or practice action the Government's

> initial burden is to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers. . . . At the initial, "liability" stage of a pattern-or-practice suit the Government is not required to offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy. Its burden is to establish a prima facie case that such a policy existed.

*Id.* at 360; *see also Coe v. Yellow Freight Sys., Inc.*, 646 F.2d 444, 449 n.1. ("In a true 'pattern and practice' suit, the government is not required to show individual discrimination with respect to each person for whom it seeks relief when establishing its prima facie case."). However, when the Government also seeks individual relief for the victims of the unlawful practice, the "district court must usually conduct additional proceedings after the liability phase of the trial to determine the scope of individual relief." *Teamsters*, 431 U.S. at 361.

Just as *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), sets forth the elements of a prima facie case for an individual seeking relief under Title VII,

*White v. York Int'l Corp.*, 45 F.3d 357, sets forth the elements of a prima facie case for an individual seeking relief under the ADA in this circuit, *id.* at 360-61. And, just as the Court recognized that the specifics of the *McDonnell Douglas* framework are inapplicable in certain factual situations, including when the government has brought a broad-based pattern and practice action, *see Teamsters* at 358-60, it is clear that *White* does not articulate the elements of a prima facie case when the government "seek[s] to protect the public's interest" through a pattern and practice action, *Coe*, 646 F.2d at 449 n.1. *Teamsters* sets forth a logical and efficient framework for allocating burdens of proof in pattern and practice employment discrimination suits, and we approve of the district court's use of that framework in this case. *See United States v. Morvant*, 843 F. Supp.1092, 1096 (E.D. La. 1994).

Denver also argues that the United States cannot maintain a pattern and practice action because Denver applies its policy to *all* Classified and Career Service employees and there is no disparity in treatment. We have rejected that argument in part III A.2. *supra.* The district court correctly found that Denver's undisputed policy constituted "unlawful discrimination," *Teamsters*, 431 U.S. at 360. With respect to Denver's undue hardship defense, we agree with the district court that, even viewing the evidence presented on summary judgment in the light most favorable to Denver, no reasonable trier of fact could find reassignment

-64-

constituted an undue hardship as a general matter.

Finally, we decline to address the elements the United States must prove during the remedial phase of the pattern and practice suit as that issue is beyond the scope of this interlocutory appeal. *Cf. United Transp. Union Local 1745 v. City of Albuquerque*, 178 F.3d 1109, 1114-15 (10th Cir. 1999); *Homeland Stores, Inc. v. Resolution Trust Corp.*, 17 F.3d 1269, 1271-72 (10th Cir. 1994).

## IV

We **AFFIRM** the jury verdict in favor of plaintiffs. We also **AFFIRM** the district court's denial of plaintiffs' motion for class certification and its grant of summary judgment in favor of Denver on plaintiffs' equal protection claims. We **REVERSE** and **REMAND** plaintiffs' front pay award to the district court for further consideration in light of this opinion. We **AFFIRM** the district court's grant of summary judgment in favor of the United States on the liability phase of its pattern and practice suit.