O’BRIEN, J.,
concurring.
With the following observations, I join the Order and Judgment. In the spring of 2006 Lowe was on family leave, necessary because of a knee replacement. In March, 2006, shortly after she returned to work, Lowe was informed she would be reassigned from her counselor position to that of a classroom teacher, as she was certified to teach science. The news did not sit well with her because she preferred being a counselor and did not want to return to the classroom.[1] In April she applied for a position with Guthrie Job Corps (GJC) citing the reason for wanting to leave her position with the school district as “retirement.” [2] She was offered full time employment, which she accepted on June 12, 2006. As of the date of the summary judgment motions she was still employed with GJC.
In the spring of 2006, the school district did not renew the teaching contract of Rhinehart, a high school science teacher. Lowe assumed she would be assigned to that position and so discussed the assumed change with the head of the high school science department. Later, but before the end of the school year, she notified the school district of her need for an ADA accommodation if she was going to be assigned to the Rhinehart classroom. She supported her request with a letter from her treating physician and she outlined *556 (with the help of the head of the science department) a list of accommodations she felt were necessary for her to teach in Rhinehart’s classroom. See Appendix A. Through the school chain of command she was told no accommodations would be made as she would be assigned to a non-laboratory science class.
Lowe’s assumptions about where and what she would teach may have been reasonable (they were, after all, shared by other school supervisory employees, albeit those without decision-making authority), but two additional matters must be factored into the equation. First, Lowe knew, from school policy and personal experience, that teachers were often reassigned to any position they were qualified to teach based upon the needs of the school and such assignments were often made at the last minute in the fall before school starts. Second, she was told no accommodations would be made because she would be assigned to a non-laboratory class. Again, she assumed, perhaps reasonably, such assignment was impossible because all high school science classes were laboratoiy classes. But junior high science classes, which she was certified to teach, do not have labs and any renovations to those classrooms that might have been needed to accommodate Lowe’s disabilities wei'e minimal.
Nothing happened during most of the summer, but in early August the matter was revisited when a meeting was held to discuss accommodations Lowe might require in order to teach science.[3] Lowe attended as did Superintendent Simpson, the ultimate decision-maker, and others. Lowe continued to express her preference to remain in the counselor position and her dismay at being forced back into the classroom. She wanted Simpson to revisit that decision. But the meeting also ad-di'essed her concerns about being able to effectively teach in a laboratory classroom unless her disabilities were accommodated. Simpson made clear that the major laboratory classroom renovation being pressed by Lowe, see Appendix A, would not be undertaken. As an alternative he suggested an aide might be hired to assist Lowe. Simpson claims he told Lowe she would not be required to teach a laboratory class. Lowe says no such representation was made. Pratz, a teacher advocate employed by the Oklahoma Education Association, was also at the meeting. Her recollection parallels Simpsons — “What my recollection is that Mr. Simpson’s response was, it will not be a lab science class, so it won’t need modifications.” (R. at 368.) Nevertheless, a factual dispute remains with respect to that material issue of fact. Undisputed, however, is a salient fact — Simpson never mentioned reassigning Lowe to the junior high.
It may be that Simpson had not reached a decision as to how, specifically, he would accommodate Lowe’s needs and wanted to keep his options open.[4] On August 4, two days after the meeting and without re *557 questing a definitive answer from Simpson as to what he would do in response to her concerns, Lowe sent her resignation letter, saying only, “Consider this my resignation. I am retiring.” The letter gave no notice she was resigning due to the School District’s failure to make reasonable accommodations, nor did she condition her resignation on such a failure.[5] An employer is not liable for failing to assure an employee reasonable accommodations will be made. The statute imposes liability for “not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee ...” 42 U.S.C. § 12112(b)(5)(A) (emphasis added). Lowe’s resignation may have short-circuited the process by not giving the School District an adequate time to respond.[6] We cannot know whether a reasonable accommodation would or would not have been forthcoming.
On the other hand, it could be that the junior high option was concocted, post hoc, as a convenient response to Lowe’s ADA complaint. If it was an option Simpson was actively considering at the time of the August meeting, it was not then communicated to Lowe or anyone else; perhaps with good reason, perhaps not. The record sheds no light.
The School District argues, correctly, I think, that the interactive process is merely a method of facilitating statutory goals. It is a recommendation, not a statutory requirement. White v. York Int’l Corp., 45 F.3d 357, 363 (10th Cir.1995). “The federal regulations implementing the ADA ‘envision an interactive process that requires participation by both parties.’ ” Templeton v. Neodata Servs., Inc., 162 F.3d 617, 619 (10th Cir.1998) (quoting Beck v. Univ. of Wis. Bd. of Regents, 75 F.3d 1130, 1135 (7th Cir.1996)) (emphasis added). While it may be an essential component to understand the employee’s needs, “a plaintiff cannot base a reasonable accommodation claim solely on the allegation that the em *558 ployer failed to engage in an interactive process.” Rehling v. City of Chicago, 207 F.3d 1009, 1016 (7th Cir.2000) (“[T]he interactive process is a means and not an end in itself.”). Clearly an employer could, with impunity, ignore the interactive process so long as it reasonably accommodated employee needs.
This case comes down to whether the School District would have accommodated Lowe’s needs by reassignment to a non-laboratory classroom (as it could have done) had she not resigned in a huff.[7] Since the record does not supply an answer to that question with reasonable certainty this case must be tried.
APPENDIX A
Orthopaedic [sic ] Specialists Incorporated
April 5, 2006
RE: Terrianne Lowe
TO WHOM IT MAY CONCERN:
Terrianne Lowe is a patient of mine who suffers from polio with postpolio syndrome extending back to 1952. She has also had multiple surgical procedures on both lower extremities for contractures and weakness, and recently has undergone bilateral knee replacement with ultimate revision of her right knee replacement. She has both proximal and distal weakness in her lower extremities.
Because of her muscle weakness and joint problems, this patient is unable to stand for any longer than ten minutes at a time and is unable to do any prolonged walking without orthotics and aids. She has a functional limitation which requires sedentary work only. She is unable to repetitively climb stairs; is unable to kneel, squat, or crawl.
Because of her significant functional limitations and disabilities, she will require appropriate accommodations at work to allow her to function within her limited capacity.
If I can provide any further information, please do not hesitate to let me know.
Sincerely,
/s/ Paul R. Miller, M.D.
(R. at 292.)
Laboratory Safety Modifications for Physical Disabilities
Classroom will need to be modified so teacher can be accessible to each table.
(Wider aisles to allow wheel chair/walker access)
Lab stations will need to be lowered. Chalkboards/whiteboards will need to be lowered so are accessible from a sitting position.
Overhead cart and screen will need to be modified to accommodate a sitting position.
*559 Eyewash station will need to be added that is accessible.
Fume hood will need to be added that is accessible.
Safety Shower will need to be added that is accessible.
Fire extinguisher and fire blanket need to be lowered.
Chemical and flammable storage will need to be modified so it is accessible.
General lab equipment storage will need to be modified so it is accessible.
Teacher aide will be needed to gather lab equipment, transport chemicals, and monitor safety issues during labs.
(R. at 295.)

. Lowe originally complained that the school violated the Family Medical and Leave Act and her “demotion” from the counselor position violated the ADA. She conceded the FMLA claim on summary judgment motions and summary judgment was entered against her on the demotion claim. She does not appeal from that decision.

. Lowe was eligible to retire in 2002. Since then she had explored other job opportunities, hoping other employment would offer her two retirement incomes.

. The School District was not aware of Lowe’s full time position with GJC.

. Bill Sykes, former principal of Guthrie High School testified it is not uncommon to make classroom assignment changes shortly before the beginning of the school year. Chadwick, the principal at the time Lowe was notified she would be reassigned, testified that “[a] teacher can be reassigned at any time.... You could show up on the first day of school and if the building principal felt like they needed you in another area, could that be changed, yes, it could." (R. at 68-69, 307.) It is also uncontested that Lowe herself modified schedules at Chadwick's request while working at the high school. Thus, no matter what Lowe reasonably believed would probably happen, she did not know where she would finally be assigned. Unlike the plaintiff in Albert v. Smith’s Food & Drug Ctrs., Inc., Lowe did not wait for a final determination from the school, nor did she attempt other *557 positions before she was faced with the choice of endangering her health or resigning. 356 F.3d 1242, 1246 (10th Cir.2004).

. The record leaves no doubt the master schedule could easily change at any time. When there is room for doubt, a plaintiff cannot assume the worst. Rather, to demonstrate an employer will no1 make a reasonable accommodation, the statutory requirement for imposing liability, a plaintiff must show a specific request for a final determination and, if the employer does not respond in a reasonable time or reasonable accommodation is refused, the employer's decision is fair game. Of course, a plaintiff may bypass the interactive process when "an employer has essentially foreclosed the interactive process through its policies or explicit actions.” Davoll v. Webb, 194 F.3d 1116, 1133 (10th Cir. 1999). In Davoll, we excused the plaintiff's failure to make a specific request for reassignment because the City had a written policy against reassignment and she was also explicitly told by her superior that the City would not help her find another position. Id. Unlike Davoll, the School District’s written policy was to accommodate disabilities and no one explicitly told Lowe she must teach in a certain classroom without accommodation.

. There is danger in focusing on the process and not the result. The facts show the School District was looking for a new principal during this time frame and we cannot know all the other administrative duties and decisions which the School District must attend to prior to a school year. When we look to the timing of the School District’s actions and Superintendent’s preparation for a meeting as reasons to impose liability, we move dangerously close to asserting ourselves into the management of day-to-day school administration priorities. We "must be mindful of the primary management role of [school district] officials who should be free from second-guessing or micro-management from the federal courts.” Estate of DiMarco v. Wyo. Dep't of Corr., 473 F.3d 1334, 1342 (10th Cir.2007) (addressing management role of prison officials).

. The School District's behavior is not a model for interactive engagement. However, the interactive process creates a duty on both parties to act in good faith. Smith v. Midland. Brake, Inc., 180 F.3d 1154, 1172 (10th Cir. 1999). Lowe's good faith in the process is equally as questionable as the School District’s. It was no secret Lowe resented her removal from the counseling position and did not want to return to the classroom. Lowe testified "[tjhere were some places that they could have put me and that were discussed with Mary Pratz and with Lori Allen [head of high school science department] and with Michelle Redus. There were places that they could have put me.” (R. at 259.) But Lowe never presented these alternatives to Simpson. (Id.) Lowe also testified there were some science classrooms at the high school where she could teach which would only require the lowering of the blackboard. The record does not indicate Lowe suggested she be assigned to these classrooms. Under these circumstances, it seems rather arbitrary to mention only the School District’s shortcomings in the process.