[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-11407

Non-Argument Calendar

_____

BRENDA HAIRSTON,

Plaintiff-Appellant,

*versus*

COMMUNITY HOSPITAL HOLDING COMPANY, LLC,
d.b.a. Optim Health Systems,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 4:22-cv-00193-RSB-CLR

_____

Before ROSENBAUM, NEWSOM, and GRANT, Circuit Judges.

PER CURIAM:

Brenda Hairston appeals the district court's grant of summary judgment to her former employer, Optim Health Systems, on her claims of race discrimination, disability discrimination, and retaliation. After careful review, we affirm the grant of summary judgment.

## I.

Hairston is an African-American woman. She worked as a Medicare claims analyst in Optim's billing department. In that role, she assisted in collecting outstanding medical debt from third-party insurance providers. Hairston started at Optim in May 2018, through a temp agency, and then was hired as an employee in October 2018.

Hairston testified that, in March 2019, her supervisor, Cindi Ashley, began talking to her in a derogatory and unprofessional way. Hairston also felt that her workload was becoming heavy and noted that Ashley began emailing her more frequently and complaining about "simple" things. In addition, according to Hairston, Ashley once ordered her to perform work that was the responsibility of a white coworker.

Feeling that she was being treated unfairly, Hairston applied for an open position in a different department on March 25, 2019. As part of the application process, Hairston took a content or

competency test, which she believes was not a common requirement. She also sat for an interview with Michelle Magdeburg. During the interview, according to Hairston, Magdeburg treated her unprofessionally, demanding to know why she was trying to transfer and suggesting she should get better at her current job. Hairston had seen Magdeburg speaking with Ashley before the interview, and she suspected that Ashley coached Magdeburg for the interview.

On March 26, 2019, the day after Hairston applied for a new position, Ashley called Hairston into her office and gave her a disciplinary-action form for failing to complete certain spreadsheets. Hairston asked why she was being written up, and Ashley replied that Hairston had failed to complete tasks by certain dates.

On March 29, 2019, Hairston met with manager Don Taylor and told him "some of the things that [had been] happening" and about the write-up. Taylor encouraged Hairston to put her issues into a written grievance. Hairston emailed a formal grievance to Taylor, Human Resources Director Natalie Tambon (formerly Natalie Peterson), and CEO David Perry on April 2, 2019.

In the grievance, Hairston wrote that Ashley had created a toxic work environment. Hairston described the circumstances we've summarized above and asserted that "two other Caucasian employees . . . were transferred to other departments with ease." Hairston wrote that Ashley's "[r]etaliations . . . seemed to have escalated after [Hairston] applied for the [other] position" and that Ashley "ha[d] never made [her] feel as if [she] were an [e]qual part

of her . . . [t]eam," and was "partial to her Caucasian employees." Hairston advised that she was the only African-American employee under Ashley's management until a new employee started on March 19. She also described the incident in which Ashley allegedly ordered her to perform work that was the responsibility of a white coworker. Hairston alleged that these actions constituted racial discrimination and bullying, and that Hairston had learned that other African-American women who had worked under Ashley had also suffered discrimination and bullying and had reported it to governmental officials.

On April 2, 2019, Tambon responded to Hairston's grievance email and told her that Human Resources would "begin the grievance process" and follow up with Hairston the next day at work.

Later that same day, Hairston emailed Ashley. Hairston advised Ashley that she "ha[s] a migraine and can't see or focus well" and was "going to the doctor." Hairston testified that Ashley had been staring at her and peppering her with questions about an account. When Hairston left work, she drove to the nearest Urgent Care, where a nurse practitioner told her that she was suffering from anxiety. The Urgent Care gave Hairston a doctor's note, which requested that Hairston be excused from work until she could visit with her primary-care physician.

In an email on April 7, 2019, Hairston informed Optim that, at a follow-up appointment on April 5, 2019, her doctor determined "that [she was] unable to return to work until further notice due to

[her] condition." Hairston also asked about pursuing her grievance. Human Resources representative Jessica Drew responded the next day. Drew said that Hairston was "not eligible for [Family Medical Leave Act leave] as you must be employed for a year and have worked 1250 hours," and that Hairston "must return to work tomorrow," April 9, 2019. At Hairston's request, Human Resources provided Optim's benefit guide and her personal time off ("PTO") accrual.

On April 9, 2019, Drew emailed Hairston. Drew told Hairston that Optim had not "received notification from you regarding your return" and asked whether Hairston would "be returning to work today." Hairston's daughter responded on Hairston's behalf, but Drew said she could not discuss employee matters with her and would attempt to reach Hairston directly. The next day, after attempting to call Hairston, Drew wrote an email informing Hairston as follows:

> As previously stated you are not eligible for FMLA at this time. Your time off balances will exhaust on Tuesday, April 16. Please provide us with your medical documentation and if you will be returning on Wednesday, April 17th. If you do not return on Wednesday you will have exhausted all time off available and will be considered job abandonment.

Hairston responded that she would be ready "to return to work" when released by her doctor, and attached her doctor's notes.

Then, on April 15, 2019, Hairston sent an email to Drew acknowledging the company's position and asking if "any exception can be made to that policy to grant me additional leave." Drew replied that "Optim made a two[-]week[] accommodation but no other time off can be granted at this time."

Human Resources Director Tambon testified that there were no types of leave an employee could take aside from PTO and FMLA leave, and that Optim had a policy or practice of denying additional leave. And she explained that, in Optim's view, it was not reasonable to grant Hairston an "indefinite leave period" because "the work was already greatly falling behind and the volumes were increasing."

Hairston sued Optim in August 2022, alleging claims of race discrimination and retaliation under Title VII, 42 U.S.C. § 2000e-2 & -3, and 42 U.S.C. § 1981, and of disability discrimination and retaliation under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112. After discovery, Optim filed a motion for summary judgment, which the district court granted, concluding that no reasonable jury could find in favor of Hairston on the essential elements of her claims. Hairston now appeals.

## II.

We review de novo the grant of summary judgment. *Anthony v. Georgia*, 69 F.4th 796, 804 (11th Cir. 2023). Summary judgment is appropriate if there is no genuine dispute of material fact, viewing evidence in the light most favorable to the nonmovant. *Id.* A genuine issue exists if a reasonable jury could return a verdict for

the nonmovant. *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1284–85 (11th Cir. 1997). But "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986) (citations omitted).

### III.

The ADA prohibits discrimination "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). To prevail under the ADA, a plaintiff "must show that: (1) she is disabled, (2) she was a 'qualified individual' when she was terminated, and (3) she was discriminated against on account of her disability." *Frazier-White v. Gee*, 818 F.3d 1249, 1255 (11th Cir. 2016).

A "qualified individual" under the ADA is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8). "The ADA requires an employer to make reasonable accommodations to an otherwise qualified employee with a disability, unless doing so would impose an undue hardship." *Frazier-White*, 818 F.3d at 1255 (cleaned up).

An employer's "duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." *Gaston v. Bellingrath Gardens & Home, Inc.*, 167 F.3d 1361, 1363–64 (11th Cir. 1999). Only after an employee has requested a reasonable accommodation must their employer initiate an informal, interactive process to select an appropriate

accommodation. *Owens v. Governor's Off. of Student Achievement*, 52 F.4th 1327, 1334–35 (11th Cir. 2022).

We have recognized that a "leave of absence might be a reasonable accommodation in some cases." *Wood v. Green*, 323 F.3d 1309, 1314 (11th Cir. 2003). But that's so only if it would allow the employee to "perform his or her job duties in the present or in the immediate future." *Id.* ("The ADA covers people who can perform the essential functions of their jobs presently or in the immediate future."); *see Duckett v. Dunlop Tire Corp.*, 120 F.3d 1222, 1226 (11th Cir. 1997) (stating that an employer does not violate the ADA "by refusing to grant an employee a period of time in which to cure his disabilities where the employee sets no temporal limit on the advocated grace period, urging only that he deserves sufficient time to ameliorate his conditions") (quotation marks omitted). And it does not appear we have ever held that an employer violated the ADA by failing to grant a medical leave of absence. *Cf. Frazier-White*, 818 F.3d at 1256 ("Plaintiff's request for an indefinite extension of light-duty status was unreasonable as a matter of law.").

Here, the district court properly granted summary judgment to Optim on Hairston's ADA claim. Hairston took leave after experiencing a migraine and symptoms of an anxiety disorder. During her two-week absence, she consistently told Optim that she could not return to work until cleared by her doctor. But Hairston never set a "temporal limit on the advocated grace period" in her communications, or provided any indication of when or how she would be able to resume her job in the immediate future. *Duckett*,

120 F.3d at 1226; *see Wood*, 323 F.3d at 1314.  Accordingly, undisputed evidence reflects that Hairston requested an indefinite leave of absence in which to ameliorate her condition, which is not a reasonable accommodation under our precedent. *See id.*  So Optim did not violate the ADA by refusing that accommodation or by failing to engage in the interactive process. *See Owens*, 52 F.4th at 1334–35.

Hairston maintains that she should be excused from requesting a definite period of leave because it would have been a futile gesture to do so, given Optim's stated policy not to grant additional leave beyond PTO or FMLA.  In Title VII cases, we have held that a plaintiff may be excused from applying for a position where "she refrained from applying due to a justifiable belief that the employer's discriminatory practices made application a futile gesture." *E.E.O.C. v. Joe's Stone Crabs, Inc.*, 296 F.3d 1265, 1274 (11th Cir. 2002); *see Int'l B'hood of Teamsters v. United States*, 431 U.S. 324, 367 (1977).  The Tenth Circuit has extended that reasoning to the ADA and requests for reasonable accommodations, holding that "[i]f a disabled employee actually knows of an employer's discriminatory policy against reasonable accommodation, he need not ignore the policy and subject himself 'to personal rebuffs' by making a request that will surely be denied." *Davoll v. Webb*, 194 F.3d 1116, 1132–33 (10th Cir. 1999).

We assume without deciding that the "futile gesture" doctrine applies when assessing reasonable accommodations under the ADA.  But it doesn't help Hairston in this case.  As the district

court indicated, this is not a case where the plaintiff "refrained from [requesting an accommodation] due to a justifiable belief that the employer's discriminatory practices made [the request] a futile gesture." *Joe's Stone Crabs, Inc.*, 296 F.3d at 1274. Rather, the record makes clear that Hairston requested, as an exception to company policy, "to grant [her] additional leave." Unlike the officer in *Davoll*, who did not request any accommodation due to a policy which "essentially foreclosed the interactive process," Hairston requested leave, but simply failed to provide any estimated end-date for the leave she desired. *Cf. Davoll*, 194 F.3d at 1127, 1133.

Hairston's claim that, but for Optim's policy, she would have requested a period of definite leave defies logic and the record. Construed in Hairston's favor, Optim's policy simply prohibits additional leave, whether definite or indefinite, so there is no basis to conclude that the policy deterred Hairston from requesting definite leave but not indefinite leave. Nor does the record suggest that Hairston could have requested a definite period of leave, since her correspondence to Optim shows she did not know when she would be cleared by her doctor. Hairston maintains that she could have returned to work within two weeks. But the two-week timeline referred to when Hairston expected to see a psychiatrist, not when she expected to return to work, which was still unknown when her leave balances exhausted on April 16. These circumstances do not create a genuine dispute of material fact as to whether Hairston was denied a reasonable accommodation.

For these reasons, we agree with the district court that Optim is entitled to summary judgment on this claim.

## IV.

Title VII prohibits retaliation against employees because they engaged in protected conduct, which includes opposition to practices made unlawful.[1]  42 U.S.C. §§ 2000e-3(a); *Howard v. Walgreen Co.*, 605 F.3d 1239, 1244 (11th Cir. 2010).  To establish a *prima facie* case of retaliation under Title VII, a plaintiff must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there was a causal link between the protected expression and adverse action.  *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).

"These three elements create a presumption that the adverse action was the product of an intent to retaliate." *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181–82 (11th Cir. 2010).  If the plaintiff establishes a *prima facie* case, the defendant must "come forward with legitimate reasons for the employment action to negate the inference of retaliation."  *Goldsmith*, 996 F.2d at 1163.  "[T]he plaintiff then bears the burden of proving by a preponderance of the evidence that the reasons offered by the defendant are

---

[1] Hairston also brings a retaliation claim under 42 U.S.C. § 1981.  *See CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008) (holding that § 1981 encompasses claims of employment-related retaliation).  We have said that "Title VII and § 1981 have the same requirements of proof and use the same analytical framework," *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1256–57 (11th Cir. 2012), so we analyze the claims jointly.

pretextual." *Id.*; *see also Johnson v. Miami-Dade County*, 948 F.3d 1318, 1325 (11th Cir. 2020).

"To prove that an employer's explanation is pretextual, an employee must cast enough doubt on its veracity that a reasonable factfinder could find it unworthy of credence." *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1307 (11th Cir. 2023) (quotation marks omitted). In attempting to show pretext, an employee is "not allowed to recast an employer's proffered nondiscriminatory reasons or substitute [her] business judgment for that of the employer," but must "meet that reason head on and rebut it." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (*en banc*). "[T]he employee cannot succeed by simply quarreling with the wisdom of that reason." *Id.* "Instead, she must point to weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the justification." *Berry*, 84 F.4th at 1308 (quotation marks omitted).

A plaintiff can make out a *prima facie* case of retaliation based on close temporal proximity between the statutorily protected activity and the adverse employment action. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). At the pretext stage, though, temporal proximity alone is generally not enough. *See Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1138 n.15 (11th Cir. 2020) (*en banc*). And "the intervening discovery of employee misconduct can sever the causal inference created by close temporal proximity." *Berry*, 84 F.4th at 1309. Similarly, while "an employer's deviation from its own standard procedures may serve as evidence of pretext," *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439

F.3d 1286, 1299 (11th Cir. 2006), "[s]tanding alone, deviation from a company policy does not demonstrate discriminatory animus, *Mitchell v. USBI Co.*, 186 F.3d 1352, 1355–56 (11th Cir. 1999). Rather, "[t]o establish pretext, a plaintiff must show that the deviation from policy occurred in a discriminatory manner." *Rojas v. Florida*, 285 F.3d 1339, 1344 n.4 (11th Cir. 2002).

We assume that Hairston established a *prima facie* case. As the court noted, Hairston was terminated on April 17, 2019, just fifteen days after she filed her grievance alleging race discrimination by her supervisor Ashley, which is probably close enough to suggest "that the protected activity and the adverse action were not wholly unrelated."[2] *Gogel*, 967 F.3d at 1135; *see Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006) ("The close temporal proximity between Hurlbert's request for leave and his termination—no more than two weeks, under the broadest reading of the facts—is evidence of pretext, though probably insufficient to establish pretext by itself.").

Nevertheless, Hairston has not established a genuine issue of material fact as to pretext or retaliatory intent. Optim met its burden of identifying a legitimate, nondiscriminatory reason for Hairston's termination: Hairston's "failure to return to work once

---

[2] While Optim claims that an "intervening action"—Hairston's "refusal to return to work or provide a return to work date"—erased any causal inference from temporal proximity, this argument goes to the issue of pretext, not the *prima facie* case. *See, e.g.*, *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1309–10 (11th Cir. 2023) (evaluating intervening events at the pretext stage).

she had exhausted all available PTO." The record establishes that Hairston did not return to work on April 3, 2019, the day Tambon said she would follow up with Hairston about her April 2 grievance, or any time thereafter before her termination on April 17, 2019, despite repeated warnings that she would be dismissed if she failed to return. Thus, despite the close temporal proximity, "the intervening discovery" of grounds for termination—namely, the failure to return to work when ordered—"undercuts the inference that Hairston's complaint[] caused her termination." *Berry*, 84 F.4th at 1309.

And Hairston has not come forward with evidence suggesting that this rationale is pretextual or that Optim was motivated by retaliatory animus. Hairston suggests that Optim's failure to identify another employee who was treated similarly is evidence of pretext. But it's Hairston's burden to show that she was treated differently than other employees, not Optim's burden to prove she was treated the same. And Hairston offered no evidence to show that any other employee was treated differently than she was in similar circumstances.

Hairston next contends that Optim failed to follow its own policies and procedures when it did not investigate her discrimination complaint, ask how much time she needed to recover, or inform her that she could exhaust her PTO. As the district court observed, though, it's difficult to see "how any alleged deficiencies in [Human Resources Director] Tambon's investigation . . . show that [Hairston] was thereby fired for filing the grievance rather than for

failing to return to work." That the investigation may have been deficient does "not meet [Optim's] reason head on and rebut it," or otherwise suggest weakness, inconsistency, or implausibility in the proffered reason. *Berry*, 84 F.4th at 1308.

As for Hairston's other claimed deviations, the evidence does not reflect that Optim actually refused to permit Hairston to exhaust her PTO, even if a Human Resources representative initially said she could not, or that Optim failed to communicate with her about her expected return to work, even if Optim did not ask Hairston how much time she thought she needed to recover. We agree with the district court that none of this evidence is strong enough, even construed in the light most favorable to Hairston, to support a reasonable inference of pretext or retaliatory animus. *See Anderson*, 477 U.S. at 249–50 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.").

Finally, we reject Hairston's arguments that Optim's decision was incoherent because of its "blatant lack of efficiency" or that Optim changed its rationale for her termination. Optim's rationale did not rely on "efficiency," and Hairston is "not allowed to recast an employer's proffered nondiscriminatory reasons or substitute [her] business judgment for that of the employer," but must "meet that reason head on and rebut it." *Chapman*, 229 F.3d at 1030. Hairston's contention that her termination was unwise, standing alone, is not enough. *See id.* Nor does the evidence suggest any genuine inconsistency in Optim's rationale. Optim's

reasons for denying Hairston's request for additional medical leave are entirely consistent with its rationale that Hairston was terminated because she failed to return to work after exhausting all company leave. *See Zaben v. Air Prods. & Chems., Inc.*, 129 F.3d 1453, 1458 (11th Cir. 1997) (noting that "differing explanations" are not "necessarily inconsistent"). And as Hairston herself notes, the evidence reflects that the company had never offered additional leave beyond PTO and FMLA.

For these reasons, we affirm the grant of summary judgment in favor of Optim on Hairston's claims under the ADA, Title VII, and § 1981.

**AFFIRMED.**